Tillery Envtl. LLC v. A&D Holdings, Inc., 2018 NCBC 12.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

TILLERY ENVIRONMENTAL LLC,

      Plaintiff/Counterclaim
Defendant,

v.

A&D HOLDINGS, INC., in its
capacity as successor-by-merger to
JBC ACQUISITION INC.,

      Defendant/Counterclaim
Plaintiff/Third-Party
Plaintiff,

and ROSS ENVIRONMENTAL
SERVICES, INC.,

      Defendant,

v.

CHRIS WEIDENHAMMER; PAUL
TAVEIRA; JOHN RUGGIERO;
PAUL BUTSAVAGE; ERIC D.
MCMANUS; J. SCOTT PEARCE;
MICHAEL STONEMAN; GERALD
WALKER; WILLIAM EVANS;
TIMOTHY PARKER; THOMAS
MORTON; JOSEPH KEITH BURCH;
CHRISTOPHER RABLEY; J.W.
HALL, JR.; CAROL LOCK; MERI-
BETH HALL; MICHAEL R.
GRIFFIN; JONATHAN E. HALL;
KURT E. KESKINEN; DANIEL L.
MARTIN; and JEFF STURGEON,

      Third-Party Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 6525

**ORDER AND OPINION ON
PLAINTIFF'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO
DISMISS**

1.    **THIS MATTER** is before the Court on (i) Plaintiff Tillery Environmental LLC ("Tillery") and Third-Party Defendants Chris Weidenhammer, Paul Taveira, and John Ruggiero's (collectively, the "Tillery Movants") Motion to Dismiss Second

Amended Counterclaim and Third-Party Complaint (the "Tillery Motion"), (ii) Third-Party Defendants Eric D. McManus, J. Scott Pearce, Michael Stoneman, Timothy Parker, Thomas Morton, Joseph Keith Burch, Christopher Rabley, J.W. Hall, Jr., Carol Lock, Meri-Beth Hall, Jonathan E. Hall, and Jeff Sturgeon's (collectively, the "McManus Movants") Motion to Dismiss Second Amended Counterclaim and Third-Party Complaint (the "McManus Motion"), and (iii) Third-Party Defendants Paul Butsavage, William Evans, Michal R. Griffin, Kurt E. Keskinen, Daniel Martin and Gerald Walker's (collectively, the "Butsavage Movants," and collectively, with all other third-party defendants, the "Third-Party Defendants") Motion to Dismiss Second Amended Counterclaim and Third-Party Complaint (the "Butsavage Motion," and collectively, with the other two motions to dismiss, the "Motions to Dismiss") in the above-captioned case.

2.      After considering the Motions to Dismiss, the arguments of counsel for the parties at the October 24, 2017 hearing on the Motions to Dismiss, and the briefs by the parties in support of and in opposition to the Motions to Dismiss, the Court hereby **GRANTS in part** and **DENIES in part** the Motions to Dismiss.[1]

---

[1] On September 29, 2017, the Court ordered a stay of discovery in this case pending the resolution of the Motions to Dismiss. Due to the anticipated delay in the preparation and publication of a written opinion resolving these Motions in light of the Court's fall trial schedule, the Court advised the parties of the Court's intended rulings on the Motions to Dismiss by email on November 1, 2017 and lifted the stay of discovery the following day so that the case could proceed expeditiously pending the formal resolution of the Motions. The Court notes that its final rulings on certain claims differ from those expressed in the November 1 email to the parties. Specifically, claims that the Court indicated it was inclined to dismiss without prejudice are dismissed with prejudice below. As was made clear by the Court's email, this Order and Opinion makes effective the Court's rulings on the Motions to Dismiss. Therefore, the Court's decisions herein are final and controlling.

*McGuireWoods, LLP, by Jodie H. Lawson, Anita M. Foss, Carlo L. Rodes, and Abbey M. Krysak, for Plaintiff Tillery Environmental, LLC and Third-Party Defendants Chris Weidenhammer, Paul Taveira, John Ruggiero, Eric D. McManus, J. Scott Pearce, Michael Stoneman, Timothy Parker, Thomas Morton, Joseph Keith Burch, Christopher Rabley, J.W. Hall, Jr., Carol Lock, Meri-Beth Hall, Jonathan E. Hall, and Jeff Sturgeon.*

*Nexsen Pruet, PLLC, by Patrick D. Sarsfield, II and Kathleen Burchette, and Wickens, Herzer, Panza, Cook & Batista Co., by Richard D. Panza, Matthew W. Nakon, and Rachelle Kuznicki Zidar, for Defendants A&D Holdings, Inc. and Ross Environmental Services, Inc.*

*Essex Richards, by Jonathan E. Buchan and Natalie D. Potter, for Third-Party Defendants Paul Butsavage, William Evans, Michal R. Griffin, Kurt E. Keskinen, Daniel Martin, and Gerald Walker.*

Bledsoe, Judge.

I.

BACKGROUND

3. The Court does not make findings of fact when ruling on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). Rather, the Court recites the relevant allegations in the pleading asserting the challenged claims—here, Defendant A&D Holdings, Inc.'s ("A&D") Second Amended Counterclaim and Third-Party Complaint (the "SACC").

A. <u>The Parties and Agreements</u>

4. This case centers around a Stock Purchase Agreement (the "SPA") and an escrow agreement (the "Escrow Agreement"), both of which facilitated a merger by stock purchase by which JBC Acquisition, Inc. ("JBC")—a subsidiary of Ross Environmental Services, Inc. ("Ross")—purchased the shares of A&D (the "Sale") and

was then merged into A&D (the "Merger") (for purposes of this Opinion, the Court refers to Defendant/Counterclaim Plaintiff/Third-Party Plaintiff A&D in its capacity as successor by merger to JBC as "Buyer" and the pre-Sale A&D entity as "Seller"). (Second Am. Countercl. & Third-Party Compl. ¶¶ 1, 24 [hereinafter "SACC"], ECF No. 35.) The SPA was executed and the Sale was completed on May 8, 2015, (SACC ¶ 24), and the Merger was effectuated on July 21, 2015, (SACC ¶ 1).

5. Prior to the Sale, Seller was owned and/or operated by Plaintiff/Counterclaim Defendant Tillery and Third-Party Defendants. Tillery owned more than eighty percent of Seller's stock before the Sale and served as the shareholder representative for all pre-Sale shareholders of Seller during the SPA's negotiation and the closing of the Sale. (SACC ¶ 2.) Third-Party Defendants were all officers or shareholders of Seller. (SACC ¶¶ 3–23.) Several of the Third-Party Defendants play a more prominent role in Buyer's allegations—in particular, Chris Weidenhammer ("Weidenhammer"), a member and manager of Tillery, an officer of Seller, and the only Third-Party Defendant who did not own shares of Seller; Paul Taveira ("Taveira"), an officer, manager, and shareholder of Seller; and John Ruggiero ("Ruggiero"), also an officer, manager, and shareholder of Seller. (SACC ¶¶ 3–5.) The Court sets forth in the succeeding paragraphs Buyer's allegations in support of its claims against these individuals and the remaining Third-Party Defendants as well as its counterclaims against Tillery.[2]

---

[2] Buyer's SACC asserts counterclaims against Tillery and similar claims against Third-Party Defendants. For ease of reference, the Court will refer to Buyer's counterclaims and claims together as Buyer's "claims."

6. The SPA between Buyer and Seller was executed on May 8, 2015 by Buyer, Seller, Tillery, Taveira, Ruggiero, and the remaining Third-Party Defendants. (SACC Ex. 1, at Joinder Signature Pages [hereinafter "SPA"], ECF Nos. 35.1, 35.2.) The SPA stated that the shareholders of Seller would indemnify Buyer if certain representations and warranties in the SPA were breached. (SPA § 7.2(b).) To pay any such claims, the Escrow Agreement required Buyer to set aside approximately $2.8 million in a separate escrow account. (SACC Ex. 2, at 1–2 [hereinafter "Escrow Agreement"], ECF Nos. 35.3, 35.4.) Any demand for payment against this amount was required to be received by the designated escrow agent by November 8, 2016. (Escrow Agreement 3; *see* SACC Ex. 27, at 2, ECF No. 35.31.) The representations and warranties applicable to this dispute continued until November 8, 2016 as well. (SPA § 7.1(a).) If Buyer provided proper notice under the terms of the SPA, the representations and warranties would survive and continue until any claim was resolved. (SPA § 7.1(c).) Buyer alleges that it provided timely and proper notice and timely filed its Counterclaim and Third-Party Complaint concerning several issues that came to light after the Sale that Buyer believes significantly affected A&D's value.

B. Safety Rating Allegations

7. A&D and its wholly-owned subsidiaries (collectively, the "A&D Companies") are involved in the businesses of, among other things, transporting and managing hazardous and non-hazardous waste, remediating contaminated water and soils, and responding to environmental emergencies. (SACC ¶ 26); *see also Tillery Envtl. LLC*

*v. A&D Holdings, Inc.*, 2017 NCBC LEXIS 68, at *2 (N.C. Super. Ct. Aug. 4, 2017). In these industries, a company's safety record is important. Customers and prospective customers require certain safety measurements be met as a prerequisite for doing business or maintaining business relationships. (SACC ¶ 28.) One such safety measurement is a company's Experience Modification Rate ("EMR"). (SACC ¶ 27.) Another is a company's Total Recordable Incident Rate ("TRIR"). (SACC ¶ 30.)

8. A company's EMR is a numerical rating calculated and assigned by the National Council on Compensation Insurance ("NCCI"). (SACC ¶ 27.) NCCI calculates a company's EMR by taking the company's "workers' compensation loss experience and comparing it to the average loss experience of other businesses in the same industry classification." (SACC ¶ 27.) NCCI uses loss experiences over a three-year period to calculate the EMR. (SACC ¶ 27.) As an example, A&D's 2015 EMR was calculated from loss experiences in 2011, 2012, and 2013. (SACC ¶ 27.)

9. The average loss for businesses in a particular industry is represented by an EMR of 1.0. (SACC ¶ 27.) If a business has an EMR over 1.0, for example, 1.06, the business has an above-average number of workers' compensation losses. (SACC ¶ 27.) A number below 1.0, for example, 0.96, would indicate a business has a below-average number of workers' compensation losses, and thus, a better-than-average safety record. (SACC ¶ 27.)

10. A company's TRIR, on the other hand, "accounts for how many Occupational Safety and Health Act ('OSHA') recordable incidents a company experiences per

number of hours worked." (SACC ¶ 29.) The more OSHA incidents a business experiences, the higher the business's TRIR. (SACC ¶ 29.)

11. Buyer's allegations regarding safety ratings focus mainly on two central points. First, Buyer claims Seller concealed or misrepresented information about Seller's EMR for specific years. Second, Buyer alleges Seller concealed actual workplace injuries that have contributed to further safety issues that Buyer must now confront. Buyer asserts that the concealment of this information denied Buyer its opportunity to accurately evaluate what a fair purchase price for A&D would be or whether Buyer wished to purchase the company at all. According to Plaintiff, Seller's intentional failure to disclose this information caused Buyer to pay an "artificially inflated purchase price for" A&D. (SACC ¶ 87.)

### 1. EMR Allegations

12. Leading up to the Sale, Buyer submitted due diligence requests to Seller. (SACC ¶¶ 34–35.) Among these requests was one that sought Seller's "EMR history." (SACC ¶ 35.) In response to this request, Buyer received information about Seller's EMR for the years 2007–14. (SACC ¶ 43.) Buyer alleges (i) that Seller knew prior to the Sale that some of the EMR determinations provided were manipulated and inaccurate but concealed that fact, and (ii) that Seller was aware that its 2015 EMR was going to be set at 1.13 but attempted to hide that fact from Buyer. (SACC ¶¶ 33, 51, 68.)

13. In October 2014, Seller provided a presentation to Buyer that included literature citing Seller's "long track record of safety and environmental compliance."

(SACC ¶ 31.)  The presentation literature also stated that Seller maintained an EMR "consistently below 1.0."  (SACC ¶ 31.)  Buyer alleges that this statement was false when made and that Seller's past EMR figures had been manipulated to appear lower than they were.  (SACC ¶¶ 55–68.)  Buyer also alleges that Tillery, Weidenhammer, Taveira, and Ruggiero knew as much but caused Seller to make the representations, and the later misleading due diligence disclosures, anyway.  (SACC ¶ 31.)

14.    In particular, Buyer asserts that the EMR information it received from Seller for the years 2012, 2013, and 2014 was misleading.  (SACC ¶¶ 57–59.)  Buyer alleges that the EMR numbers for these years had been artificially lowered by Seller's practice of providing misleading information to NCCI in violation of NCCI protocols.  (SACC ¶ 61.)  This practice allegedly started in 2014 and worked as follows.  Seller, assisted by a hired business called AccuComp USA, would pay insurance carriers rebates for closed claims.  (SACC ¶ 66.)  In exchange for these payments, the insurance carriers would draft correspondence for Seller, stating that the costs associated with the claims were lower than previously reported due to "errors." (SACC ¶ 66.)  Seller would then seek an ex post facto modification to its EMR determination from NCCI, claiming that the revision was needed because previous errors associated with workers' compensation claims had now been corrected.  (SACC ¶ 66.)  Buyer alleges that this practice—sometimes referred to as "buying down"—is not accepted in A&D's industry or sanctioned by NCCI as a permissible method of managing a business's EMR.  (SACC ¶ 66.)

15. Buyer alleges that, as a result of Seller's "buying down" its EMR for past years, the EMR figures Buyer received for the years 2012–14 were not the rates originally calculated for those years by NCCI. Specifically, during due diligence, Seller reported its 2012 EMR as 0.97. (SACC ¶ 57.) In reality, in February 2012, NCCI set Seller's 2012 EMR at 1.0. (SACC ¶ 57.) Likewise, the 2013 EMR of 1.03 was originally set at 1.05; the 2014 EMR of 0.99 was originally set at 1.06. (SACC ¶¶ 58–59.) Seller did not disclose these adjustments or its practice of "buying down" its EMR to Buyer. (SACC ¶ 68.)

16. In addition to these past EMR misrepresentations, Buyer also alleges that Seller improperly concealed its 2015 EMR. Several days after Buyer's December 29, 2014 due diligence request for "EMR history," Weidenhammer sent an email to Paul Butsavage ("Butsavage"), an officer, manager, and shareholder of Seller, asking Butsavage to obtain Seller's EMR history. (SACC ¶ 36.) Butsavage did so by contacting Ironwood Benefits Advisory Services, LLC ("Ironwood"), Seller's insurance broker. (SACC ¶ 37.) Ironwood responded to Butsavage's request on January 6, 2015 by supplying Butsavage with Seller's EMR figures from 2010 up through 2015. (SACC Ex. 9, ECF No. 35.13.) Since December 2, 2014, Seller, Tillery, Weidenhammer, Taveira, and Ruggiero had allegedly been aware that Seller's 2015 EMR would be set at 1.13, effective February 24, 2015. (SACC ¶ 33; SACC Ex. 5, at 1, ECF Nos. 35.8, 35.9.) The information Butsavage received from Ironwood confirmed this—Buyer's 2015 EMR was 1.13. (SACC Ex. 9.)

17. Upon receipt, Butsavage sent the 2010–15 EMR figures to Taveira but told Taveira to call him before the information was sent on to Buyer. (SACC ¶ 38.) The two had a phone call, and minutes later Butsavage sent Taveira another email with EMR figures for the years 2010 through 2014. (SACC ¶ 39.) The 2015 EMR information was omitted. (SACC ¶ 39.)

18. That same day, Butsavage requested Seller's EMR information for the years 2007–09 from Ironwood. (SACC ¶ 40.) Ironwood replied with Seller's EMR figures for the years 2007–15. (SACC ¶ 41.) Butsavage sent this information to Taveira, again omitting the 2015 EMR of 1.13. (SACC ¶ 42.) This information was then provided to Buyer without mention of the 2015 EMR determination. (SACC ¶ 43.)

19. As the Sale drew closer, Butsavage, Weidenhammer, and Taveira engaged in talks about potential ways to lower Seller's 2015 EMR. (SACC ¶¶ 44–48.) On January 23, 2015, Butsavage sent an email to Weidenhammer and Taveira relaying his discussion with an Ironwood representative about Seller's 2015 EMR. (SACC Ex. 16, ECF No. 35.20.) Butsavage wrote that whether Seller needed to take steps to adjust its EMR immediately depended in part on how a new owner would manage the A&D Companies—if the A&D Companies' insurance became integrated "in a package of companies," the EMR could be diluted by the other companies in the group, and no adjustment would be needed. (SACC Ex. 16.) Butsavage then asked, "Is it acceptable for me to speak to any of their team members as [sic] ask what their intentions are for integration of A&D into their insurance program?" (SACC Ex. 16.) Weidenhammer replied, "Yes, but stay focused on your message and position this just

as being [sic] a proactive inquiry so that we renew our coverages next month on the most economical basis possible." (SACC Ex. 17, ECF No. 35.21.) Butsavage responded and indicated that he understood and was "not pressing the panic button about an EMR over 1.0." (SACC Ex. 18, ECF No. 35.22.)

20. On February 24, 2015, unbeknownst to Buyer, NCCI officially set Seller's EMR for 2015 at 1.13. (SACC ¶ 49.) Several days after this, on March 3, 2015, Seller produced to Buyer information responsive to still-outstanding due diligence issues. (SACC ¶ 51.) Seller's correspondence about this production did not reference EMR or suggest in any way that information about Seller's EMR was included in the disclosures. (SACC ¶ 51.) Among the information produced was a disclosure document from Ironwood. (SACC ¶ 51.) The 2015 EMR was displayed on page eighteen of that thirty-six page document. (SACC ¶ 51.) Buyer alleges that this form of "needle in the haystack disclosure" was meant to conceal the 2015 EMR information from Buyer.

### 2. Undisclosed Injuries Allegations

21. In addition to alleged dishonesty and concealment involving Seller's EMR figures, Buyer also alleges that Seller, Tillery, Weidenhammer, Taveira, and Ruggiero withheld information about, and concealed the occurrence of, certain workplace injuries involving the A&D Companies. (SACC ¶ 72.)

22. Specifically, Buyer alleges that in the months leading up to the Sale, Seller received notice of work-related injuries occurring on January 21, 2015; February 27, 2015; March 18, 2015; April 8, 2015; and April 16, 2015 (collectively, the "Undisclosed

Injuries" or the "Injuries"). (SACC ¶¶ 73–76.) Buyer alleges that each of the Injuries ultimately contributed to an increase in A&D's EMR or TRIR, (SACC ¶¶ 74, 78), but none were disclosed to Buyer, (SACC ¶ 72).

23. In another accident on March 8, 2015, an independent contractor working at one of Seller's facilities suffered a fatal injury (the "Roofing Death" or the "Death"). (SACC ¶ 83.) In an email to Butsavage regarding the Roofing Death, Taveira wrote "We will have to disclose this to [Buyer]." (SACC ¶ 83.) Despite Taveira's statement, the Roofing Death was never disclosed, and Buyer learned of it only after the Sale. (SACC ¶¶ 83, 85.) In 2017, the deceased's family filed a lawsuit against one of the A&D Companies seeking compensation for the Roofing Death. (SACC ¶ 84.)

24. In 2016, more than a year after the Sale, Buyer was informed that its 2017 EMR would be set at 1.40. (SACC ¶ 81.) Even after taking steps to lower this number, Buyer was still left facing a 2017 EMR of 1.22. (SACC ¶ 82.) Buyer alleges that the Undisclosed Injuries directly contributed to this increase in its EMR and a coinciding increase in its TRIR. Buyer also alleges that as a result of its rising EMR and TRIR numbers, "contracts that have historically generated considerable revenue for [A&D] . . . are subject to termination." (SACC ¶ 88.) Buyer further claims that it will have a difficult time securing new contracts or renewing existing ones in light of its elevated EMR and TRIR figures. (SACC ¶ 88.)

25. In sum, Buyer alleges that the Tillery Movants—Tillery, Weidenhammer, Taveira, and Ruggiero—knowingly, intentionally, and fraudulently caused Seller to manipulate Seller's EMR history and conceal Seller's 2015 EMR, the Undisclosed

Injuries, and the Roofing Death with the intended result that Buyer would pay an artificially inflated price for A&D's shares. (SACC ¶¶ 51, 69, 71, 86, 87.) As a consequence, Buyer seeks indemnification from Tillery and all shareholder Third-Party Defendants to the extent these fraudulent and misleading acts breached representations and warranties in the SPA. (SACC ¶¶ 97–109.) Buyer also asserts claims for fraud or, in the alternative, violations of the North Carolina Securities Act (the "NCSA") against the Tillery Movants based on these alleged acts. (SACC ¶¶ 110–29.)

C.      Additional Breach of Contract Claims

26.    In addition to the above, Buyer also alleges that two invoices were erroneously included on Seller's accounts receivable ledger at closing. (SACC ¶¶ 130–45.) The first represented work done by Seller and a subcontractor for Honeywell. (SACC ¶ 131.) After closing, Buyer discovered Honeywell had paid the subcontractor directly for the work, so Buyer credited the invoice amount of $10,000 back to Honeywell. (SACC ¶ 131.) The second invoice related to work done by Seller for Alfred Benesch & Company ("Benesch"). Buyer alleges that this invoice was originally issued because Seller "failed to properly document change orders pursuant" to its agreement with Benesch. (SACC ¶ 140.) As a result, Benesch refused to pay the invoice. (SACC ¶ 141.) Because both of these amounts were listed on Seller's accounts receivable ledger and neither was collectable, Buyer also alleges that it is entitled to indemnification from Seller for these amounts pursuant to the SPA.

27. Buyer notified Tillery and the escrow agent on or before November 8, 2016 that it was demanding indemnification as a result of the Undisclosed Injuries, the Roofing Death, and the uncollectable invoices for Honeywell and Benesch. (SACC ¶ 89; SACC Ex. 26, at 2, ECF No. 35.30.) The escrow agent, having received Buyer's demand, notified Buyer and Tillery that it would not release any portion of the amount held in escrow until the parties provided joint consent in writing or a court ordered the distribution of the escrowed funds. (SACC ¶ 92.)

II.

PROCEDURAL BACKGROUND

28. After the parties failed to resolve their dispute over the escrowed funds, Tillery filed a lawsuit against Buyer and Ross. *See generally Tillery Envtl. LLC*, 2017 NCBC LEXIS 68 (discussing Tillery's claims against A&D and Ross). Buyer filed its first set of counterclaims on April 21, 2017 and subsequently amended its counterclaims twice, most recently on July 28, 2017.

29. In response to Buyer's SACC, the Tillery Movants filed the Tillery Motion, the McManus Movants filed the McManus Motion, and the Butsavage Movants filed the Butsavage Motion. The Court held a hearing on the Motions to Dismiss on October 24, 2017, at which all parties were represented by counsel. The Motions to Dismiss are now ripe for resolution.

## III.

## LEGAL STANDARD

30. In ruling on a motion to dismiss made under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court considers whether the allegations in the claimant's pleading, taken as true, "are legally sufficient to satisfy the elements of at least some legally recognized claim." *Arroyo v. Scottie's Prof'l Window Cleaning, Inc.*, 120 N.C. App. 154, 158, 461 S.E.2d 13, 16 (1995). The Court construes the allegations in the pleading "in the light most favorable to the nonmoving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 802 S.E.2d 888, 891 (N.C. 2017). Documents that are attached to and incorporated into the pleading are considered part of the claimant's allegations and may be considered by the Court, and the Court may reject allegations in the pleading that are contradicted by the attached documents. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). Such consideration does not convert the motion to dismiss into a motion for summary judgment. *Id.*

31. The Court will not grant a motion to dismiss unless it appears certain that the claimant is not entitled to relief. *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970). Put another way, dismissal under Rule 12(b)(6) is only proper (i) when the pleading reveals, on its face, that no law supports the claimant's claim; (ii) when the pleading reveals an absence of fact sufficient to make the claim; or (iii) when some fact disclosed in the pleading necessarily defeats the claimant's claim. *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). Accordingly, the Court must determine whether the allegations within the pleading, "treated as true, are

sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'Ship*, 2013 NCBC LEXIS 11, at \*20 (N.C. Super. Ct. Feb. 19, 2013) (quoting *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008)).

IV.

ANALYSIS

32.     Buyer asserts claims for breach of contract and indemnification against Tillery and all Third-Party Defendants except Weidenhammer.  Buyer also asserts claims for fraud or, in the alternative, violations of the NCSA against the Tillery Movants.  The Court begins by analyzing Buyer's claim for fraud before turning to Buyer's NCSA and breach of contract claims.

A.     Buyer's Fraud Claim

33.     Buyer's claim for fraud alleges that the Tillery Movants "produced or caused Seller Corporation to produce false and misleading due diligence information" to Buyer during negotiations and the due diligence period and concealed or omitted material information that they had a duty to disclose to Buyer.  (SACC ¶ 111.)

34.     The "essential elements of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).  As a general rule, a claimant's reliance on allegedly false statements must be reasonable, though the reasonableness of such reliance is typically a question for the

jury. *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007); *Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965) ("[W]here reliance ceases to be reasonable and becomes such negligence and inattention that it will, as a matter of law, bar recovery for fraud is frequently very difficult to determine.").

35.    To survive a motion to dismiss made under Rule 12(b)(6), a claimant asserting a claim for fraud must plead all material facts and circumstances constituting fraud with particularity, N.C. R. Civ. P. 9(b); *Moore v. Wachovia Bank & Tr. Co.*, 30 N.C. App. 390, 391, 226 S.E.2d 833, 834–35 (1976), with the exception of "malice, intent, knowledge, and other condition of mind of a person," which may be "averred generally," N.C. R. Civ. P. 9(b); *Coley v. N.C. Nat'l Bank*, 41 N.C. App. 121, 125, 254 S.E.2d 217, 219 (1979). Despite this higher standard for pleading fraud, there is no "requirement that any precise formula be followed or that any certain language be used." *Shaw. v. Gee*, 2016 NCBC LEXIS 103, at *15 (N.C. Super. Ct. Dec. 21, 2016).

36.    As indicated by the first element of a common law claim for fraud, either a false representation or the concealment of a material fact may give rise to a claim for fraud. In this case, Buyer has pleaded both occurred.

### 1. Fraudulent Concealment of the 2015 EMR

37.    Buyer first alleges that Tillery, Weidenhammer, Taveira, and Ruggiero concealed material facts from Buyer—specifically, Seller's 2015 EMR, the Undisclosed Injuries, and the Roofing Death—despite having a duty to disclose such information. The basic elements of a claim for fraud based on omission are the same

as those for any other claim for fraud, as recited above. *See, e.g., Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009). In addition to these, the claimant must also allege that the party who failed to disclose the material fact owed the claimant a duty to disclose. *Id.* (citing *Harton v. Harton*, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119 (1986)); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC LEXIS 64, at *13 (N.C. Super. Ct. June 19, 2015), *appeal dismissed*, 783 S.E.2d 264 (N.C. Ct. App. 2016) (dismissing the appeal because N.C. Gen. Stat. § 7A-27(a)(2) provided appellate jurisdiction to the Supreme Court of North Carolina), *aff'd*, 802 S.E.2d 888 (N.C. 2017) (affirming trial court's decision).

38. Although fraudulent concealment or fraud by omission "is by its very nature, difficult to plead with particularity," *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997), this Court has previously ruled that a litigant pleading an omission-based fraud claim must comply with Rule 9(b) by specifically pleading:

> (1) the relationship between plaintiff and defendant giving rise to the duty to speak; (2) the event that triggered the duty to speak or the general time period over which the relationship arose and the fraud occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what the defendant gained from withholding the information; (6) why the plaintiff's reliance on the omission was reasonable and detrimental; and (7) the damages the fraud caused the plaintiff.

*Christenbury Eye Ctr., P.A.*, 2015 NCBC LEXIS 64, at *13–14; *Island Beyond, LLC v. Prime Capital Grp., LLC*, 2013 NCBC LEXIS 48, at *19 (N.C. Super. Ct. Oct. 30, 2013); *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *9–10 (N.C. Super. Ct. June 18, 2007) (adopting pleading requirements outlined in *Breeden*, 171 F.R.D. at 195).

a. Existence of a Duty to Disclose

39. When two parties are engaged in an arm's-length transaction, two different scenarios will create a duty to disclose. The first is when one party takes an affirmative step to conceal a material fact from the other. *Hardin*, 199 N.C. App. at 696, 682 S.E.2d at 733. A concealed fact is considered material when it would have influenced the decision or judgment of another party, if known. *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75–76, 598 S.E.2d 396, 402 (2004). The second is when "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Hardin*, 199 N.C. App. at 696, 682 S.E.2d at 733 (quoting *Sidden v. Mailman*, 137 N.C. App. 669, 675, 529 S.E.2d 266, 270–71 (2000)). In addition to these situations, even when no duty to disclose exists, a party who chooses to speak has a duty to make a full and fair disclosure of facts concerning the matters on which he chooses to speak. *Ragsdale*, 286 N.C. at 139, 209 S.E.2d at 501 (citing *Low v. Wheeler*, 24 Cal. Rptr. 538, 543 (Ct. App. 1962) ("Even where there is no duty to make a disclosure, when one does undertake to inform, he must speak the whole truth.")).

40. Beginning with Buyer's fraud allegations involving Seller's 2015 EMR, the Tillery Movants first argue that Buyer's claim for fraudulent concealment should be dismissed because Buyer has not alleged that it was denied a reasonable opportunity to investigate this information or that Buyer could not have learned Seller's 2015 EMR by exercising reasonable diligence. The Tillery Movants support this argument with a quote originally from *Hudson-Cole Development Corp. v. Beemer*, 132 N.C.

App. 341, 511 S.E.2d 309 (1999): "when the party relying on [a] false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Id.* at 346, 511 S.E.2d at 313. The Tillery Movants also argue that they disclosed Seller's 2015 EMR in the subsequent insurance disclosure documents. They finally contend that they had no obligation to provide Buyer with Seller's 2015 EMR because Buyer's due diligence requested "EMR history," and the 2015 EMR had not been set at the time Buyer's request was made.

41. Addressing the Tillery Movants' first argument, the Court notes that Buyer is not alleging that Seller's 2015 EMR was a false or misleading representation that Buyer relied upon. Buyer is also not relying solely on its assertion that the 2015 EMR was a material fact Buyer could not have discovered. Buyer has also alleged that the Tillery Movants actively concealed this information in a manner "calculated to prevent discovery," (SACC ¶ 51), which itself gives rise to a duty to disclose and can support a claim for fraudulent concealment, *Hardin*, 199 N.C. App. at 696, 682 S.E.2d at 733 (stating that, between arm's-length parties, the first scenario that will create a duty to disclose is active concealment of a material fact and the second is a latent defect the other party does not know of and could not have discovered through reasonable diligence); *see Shaw*, 2016 NCBC LEXIS 103, at *11–16 (holding Rule 9(b)'s requirements were met when the plaintiff alleged facts showing that defendant "took affirmative steps to conceal material facts" and had otherwise pleaded the

essential elements of a fraud defense). The Court believes Buyer has alleged sufficient facts at the 12(b)(6) stage to plead a case of fraud by active concealment based on the 2015 EMR.

42. More particularly, Buyer alleges that it requested EMR history information from Seller and that Butsavage asked Ironwood to provide this information to Seller for purposes of responding to Buyer. The information Ironwood provided included Seller's 2015 EMR. After an alleged phone call between Butsavage and Taveira, the 2015 EMR information was deleted from the information Seller intended to provide to Buyer. When Butsavage later asked for a larger range of EMR information from Ironwood, the insurance broker again provided information that included the 2015 EMR. This information was modified again prior to its submission to Buyer to omit Seller's 2015 EMR.

43. In subsequent conversations between Weidenhammer, Taveira, and Butsavage about potential ways to lower the 2015 EMR, Weidenhammer cautioned Butsavage to "stay focused" in his communications with Buyer's team and maintain the position that Butsavage was only making "a proactive inquiry" to renew insurance coverages in a cost-effective manner. (SACC Ex. 17.) Butsavage confirmed to the other two that, in talking with Buyer, he was not going to "press[] the panic button about an EMR over 1.0."[3] (SACC Ex. 18.)

---

[3] The Tillery Movants' argue that these emails do not demonstrate an intent to conceal because Seller's "actions, if successful, would have inured to Buyer's benefit and therefore do not support a showing of intent to defraud or resulting damages." (Mem. Law Supp. Mot. Dismiss Second Am. Countercl. & Third-Party Compl. Pl. & Countercl. Def. Tillery Envtl. LLC & Third-Party Defs. Chris Weidenhammer, Paul Taveira, and John Ruggiero 11, ECF No. 63.) The Tillery Movants fail to cite any authority, however, to support the proposition

44. Eventually, Seller's 2015 "over 1.0" EMR was provided to Buyer. The figure was included on page eighteen of a thirty-six page insurance document, which was submitted to Buyer with a number of other documents responsive to still-outstanding due diligence issues. The insurance document and the correspondence sending it did not indicate that it contained information responsive to Buyer's request for EMR information. Under these circumstances, a reasonable fact finder could conclude that Seller intentionally "hid the ball" concerning Seller's 2015 EMR by burying that figure in the middle of a document in a large, unrelated production without notice or direction to Buyer. Accordingly, the Court concludes that, viewed in the light most favorable to Buyer, these pleaded facts show intentional behavior designed to prevent Buyer from reviewing Seller's 2015 EMR before the Sale closed. This intentional behavior is sufficient to support Buyer's claim for fraud.

45. The Court further concludes Buyer has alleged sufficient facts to show that Seller's 2015 EMR was a material fact. Buyer's allegations explain the importance of a company's EMR and overall safety record in A&D's industry. Seller's EMR over a period of years was part of the information Buyer requested during due diligence, and Buyer alleges that it paid an overinflated price for A&D, in part, because of the information that was withheld from Buyer, including Seller's 2015 EMR. Because, as alleged, the 2015 EMR number would have influenced Buyer's judgment in

---

that fraudulent intent cannot be present when intentional deception might result in a benefit to the defrauded individual. The Court will not adopt a rule approving of "I might have misled you, but it was for your own good" transactions, and whatever positive benefit the Tillery Movants argue Buyer received from their allegedly fraudulent concealment does nothing to alter the alleged fact that Buyer overpaid in the Sale as a result of that purported concealment.

entering into the SPA, it is a material fact. *See Godfrey*, 165 N.C. App. at 75–76, 598 S.E.2d at 402 ("A fact is material 'if the fact untruly asserted or wrongfully suppressed, if it had been known to the party, would have influenced [its] judgment or decision in making the contract at all.'" (quoting *White Sewing Mach. Co. v. Bullock*, 161 N.C. 1, 7, 76 S.E. 634, 636 (1912))).

46. Addressing the Tillery Movants' final argument—that Seller's 2015 EMR was not requested by Buyer because it was not a historical EMR figure at that point in time—the Court notes that Buyer pleads that Seller's insurance broker included the 2015 EMR every time Seller requested its own EMR history. Buyer also pleads that Seller was responsible for the omission of this information in its disclosures to Buyer. The Court concludes that the Tillery Movants' semantic argument relying upon the terms of Buyer's specific request and Seller's interpretation of that request is not susceptible to resolution as a matter of law at this stage of the case, and thus that argument cannot be a basis for granting the Tillery Motion. Buyer has sufficiently alleged that a material fact was actively concealed and thus has successfully pleaded facts giving rise to a duty to disclose.

b. Rule 9(b)'s Requirements

47. Although the Court has concluded that Buyer's SACC contains factual allegations that, if true, would give rise to a duty to disclose Seller's 2015 EMR, the Court's analysis is not complete. The Court must now examine whether Buyer's pleaded facts concerning the concealment of Seller's 2015 EMR meet the particularity requirements of Rule 9(b) as to each Tillery Movant.

48.     Rule 9(b) requires a claimant alleging fraudulent concealment to identify the person or persons who allegedly participated in the concealment. *Oberlin Capital, L.P. v. Slavin*, 2000 NCBC LEXIS 8, at *15–16 (N.C. Super. Ct. Apr. 28, 2000), *aff'd*, 147 N.C. App. 52, 554 S.E.2d 840 (2001). The claimant must plead specific facts that "give rise to an inference of knowledge, intent, or reckless disregard" as to the concealment. *Id.* at *16 (quoting *Andrews v. Fitzgerald*, 823 F. Supp. 356, 374 (M.D.N.C. 1993)). "Conclusory allegations that a defendant acted in conspiracy with others are insufficiently specific to meet the requirements of Rule 9(b)." *Id.*; *see also Oberlin Capital, L.P.*, 147 N.C. App. at 57, 554 S.E.2d at 845 (holding that the plaintiff "failed to allege sufficient facts of individual participation in any wrongdoing" by three corporate directors).

49.     In this case, Buyer claims that each of the Tillery Movants—Tillery, Weidenhammer, Taveira, and Ruggiero—concealed Seller's 2015 EMR from Buyer, but the SACC provides facts showing only Weidenhammer's and Taveira's specific, active involvement in the alleged cover-up. Whether Buyer has satisfied Rule 9(b)'s requirements against Tillery and Ruggiero requires further analysis.

50.     As for Tillery, the Court concludes Buyer has pleaded facts sufficient to state a claim for fraudulent concealment against the company. Although the SACC does not expressly allege Tillery itself directed any person to conceal Seller's 2015 EMR number, a broader reading of the allegations allows this basis for fraud to go forward against the LLC because of its agency relationship with Weidenhammer.

51. A principal is generally "responsible to third parties for injuries resulting from the fraud of his agent committed during the existence of the agency and within the scope of the agent's actual or apparent authority from the principal," even when the principal does not know of or authorize the fraudulent conduct. *Norburn v. Mackie*, 262 N.C. 16, 23, 136 S.E.2d 279, 284–85 (1964). Actual authority exists when a principal consents to an agent acting on his behalf. *Munn v. Haymount Rehab. & Nursing Ctr., Inc.*, 208 N.C. App. 632, 638, 704 S.E.2d 290, 295 (2010). Apparent authority, in contrast, "is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses." *Green v. Freeman*, 233 N.C. App. 109, 114, 756 S.E.2d 368, 374 (2014) (quoting *Pet, Inc. v. Univ. of N.C.*, 72 N.C. App. 128, 135, 323 S.E.2d 745, 750 (1984)).

52. Here, Buyer alleges that Tillery served "in the capacity of Shareholder Representative for all [pre-Sale] shareholders of A&D" for purposes of negotiating the SPA and closing the Sale. (SACC ¶ 2.) Buyer also alleges that Weidenhammer was a member and manager of Tillery and that Weidenhammer's alleged actions were performed "in his capacity as an officer of [Tillery]." (SACC ¶ 3.) Those actions included the concealment of Seller's 2015 EMR.[4]

53. Taken as true and viewed in the light most favorable to Buyer, this combination of facts allows for the conclusions that Tillery was engaged in efforts to sell its shares in A&D to Buyer and that Weidenhammer—a member and manager of Tillery—was acting to further Tillery's goals when he participated in a scheme to

---

[4] Weidenhammer also appears to have signed the SPA on behalf of Tillery. (SPA, at Joinder Signature Pages.)

conceal information harmful to Tillery's position in that transaction. A finder of fact could reasonably conclude that Weidenhammer's actions, as pleaded, were undertaken with actual or apparent authority. Thus, Buyer may base its claim for fraudulent concealment against Tillery on the concealment of Seller's 2015 EMR as well.

54. In contrast, Buyer has not alleged sufficient facts to state a claim for fraudulent concealment against Ruggiero based on the concealment of Seller's 2015 EMR. The extent of Buyer's allegations against Ruggiero in this context are that Ruggiero "concealed material information [he] had a duty to disclose[.]" (SACC ¶ 111.) No further details are provided. No alleged facts show Ruggiero was a party to the discussions between Weidenhammer, Taveira, and Butsavage about Seller's 2015 EMR or the conduct that resulted from those discussions. Buyer alleges that Ruggiero was an officer, manager, and shareholder of Seller and pleads facts showing Ruggiero's involvement in making representations contained in the SPA, but the SACC contains no facts tying Ruggiero to the EMR disclosure process, including the alleged concealment of Seller's 2015 EMR.

55. This Court has previously declined to hold that Rule 9(b) was satisfied in similar situations. *See, e.g.*, *Worley v. Moore*, 2017 NCBC LEXIS 15, at *73–74 (N.C. Super. Ct. Feb. 28, 2017) (holding that Rule 9(b) was not satisfied when plaintiffs alleged that an individual defendant was a member of a group but pleaded particular facts showing only that other members of the group were involved in making misrepresentations); *Oberlin Capital, L.P.*, 2000 NCBC LEXIS 8, at *16 (concluding

that no claim for fraudulent concealment was stated against corporate directors when plaintiff merely alleged "in a conclusory manner that the directors 'concealed, failed to disclose and otherwise hid'" material facts).  Buyer's claim against Ruggiero based on fraudulent concealment of the 2015 EMR should therefore be dismissed.

56.    In summary, the Court concludes that Buyer's claim for fraudulent concealment against Tillery, Weidenhammer, and Taveira based on the alleged concealment of Seller's 2015 EMR satisfies Rules 12(b)(6) and 9(b).  Buyer has alleged affirmative acts to conceal information harmful to Seller's interests in the Sale, the content of the information withheld, the individuals who participated in concealing the information, and the damage caused to Buyer and the benefit bestowed on Seller by the concealment.  The reasonableness of Buyer's reliance is a question typically left to the jury and cannot be determined as a matter of law on the facts as pleaded here.  *Forbis*, 361 N.C. at 527, 649 S.E.2d at 387; *Johnson*, 263 N.C. at 758, 140 S.E.2d at 314.  Buyer's fraudulent concealment claim against Ruggiero based on Seller's 2015 EMR, however, must be dismissed.  Given that Buyer has now asserted its counterclaims three separate times, the claim will be dismissed with prejudice.[5]

---

[5] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013).  In the context of a 12(b)(6) motion, "the party whose claim is being dismissed has the burden to convince the court that the party deserves a second chance[.]"  *Id.* at 192, 749 S.E.2d at 293 (quoting *Johnson v. Bollinger*, 86 N.C. App. 1, 9, 356 S.E.2d 378, 383 (1987)).  Here, the Court is not persuaded that Buyer should be entitled to a fourth chance to plead its counterclaim against Ruggiero.

2. <u>Fraudulent Concealment of the Undisclosed Injuries and Roofing Death</u>

57. Turning to Buyer's fraudulent concealment allegations involving the Undisclosed Injuries and the Roofing Death, Buyer alleges that the Tillery Movants intentionally failed to disclose material information about the Injuries and Death despite having a duty to do so. Responding to these allegations, the Tillery Movants argue that Buyer has failed to state a claim because they had no duty to disclose this information, because Buyer's allegations are conclusory and ambiguous, and because Buyer has not alleged any specific damages resulting from the nondisclosure of the Undisclosed Injuries or Roofing Death. After reviewing Buyer's pleading, the Court disagrees with the Tillery Movants at this stage of the litigation.

58. As with Seller's 2015 EMR, the Tillery Movants first attack Buyer's claim by asserting that they had no duty to disclose the Undisclosed Injuries or Roofing Death. The Tillery Movants characterize their failure to inform Buyer of these incidents as "merely Seller not volunteering information that was not requested and which it did not have an independent duty to disclose." (Mem. Law Supp. Mot. Dismiss Second Am. Countercl. & Third-Party Compl. Pl. & Countercl. Def. Tillery Envtl. LLC & Third-Party Defs. Chris Weidenhammer, Paul Taveira, and John Ruggiero 15 [hereinafter "Tillery Movants' Support Brief"], ECF No. 63.) Buyer counters this argument by asserting that the Tillery Movants incurred an obligation to disclose the Undisclosed Injuries and Roofing Death when they caused Seller to make certain representations contained in sections 4.4(m) and 4.4(n) of the SPA.

59.     As previously stated, even in an arm's-length transaction when no duty to disclose would typically exist, a seller who does speak on a matter must make a full and fair disclosure of that matter. *Freese v. Smith*, 110 N.C. App. 28, 35, 428 S.E.2d 841, 846 (1993); *Ragsdale*, 286 N.C. at 139, 209 S.E.2d at 501 ("When [the seller] undertook to describe the business as a 'gold mine' and a 'going concern' he incurred a concomitant duty to make a full disclosure of any extenuating financial circumstances which counteracted his positive assertions concerning the condition of the corporation."). Thus, even if no duty to disclose the Undisclosed Injuries or the Roofing Death was created due to active concealment or a latent defect, such an obligation would have arisen in any event if sections 4.4(m) and 4.4(n) of the SPA made "positive assertions" that would have been "counteracted" by facts about the Undisclosed Injuries or Roofing Death.

60.     Section 4.4(m) of the SPA stated: "Since the Most Recent Fiscal Month End . . . to the Company's Knowledge, there has not been any Proceeding commenced against an A&D Company nor threatened in writing or anticipated relating to an A&D Company[.]" (SPA § 4.4(m).) The "Most Recent Fiscal Month End" was designated as February 28, 2015. (SPA § 4.3(a).)

61.     The SPA specifically defined the term "Company's Knowledge" as:

[T]he actual knowledge of Paul Taveira, John Ruggiero and Daniel Martin, after reasonable inquiry by such individuals, or such other individuals as may be specifically identified with regard to a given representation or warranty as set forth herein. For purposes of this definition, "reasonable inquiry" (a) shall take into account the scope of the individual's duties and includes reasonable inquiry of the Employee(s) who are primarily responsible for, or would reasonably be expected to have actual knowledge of, the subject matter of the representation and warranty or other matter involved and (b) shall not

require that any individual make any inquiry of Persons who are not Employees or check any records not within the possession of an A&D Company.

(SPA 3.) The SPA also defined "Proceeding" to mean "any proceeding, charge, complaint, claim, demand, notice, action, suit, litigation, hearing, audit, investigation, arbitration, or mediation (in each case, whether civil, criminal, administrative, investigative or informal) commenced, conducted, heard or pending by or before any Governmental Body, arbitrator or mediator." (SPA 9.)

62. Reading these provisions together, the SPA represented to Buyer that, after a reasonable inquiry, neither Taveira nor Ruggiero had knowledge of events occurring since February 28, 2015 that would cause either of them to anticipate a "Proceeding"—i.e., a charge, claim, demand, lawsuit, investigation, arbitration, or mediation—against any of the A&D Companies. Buyer argues that the existence of the Undisclosed Injuries and Roofing Death meant this statement was either misleading or untrue. The Court concludes that a reasonable finder of fact could agree with Buyer on the facts pleaded.

63. Buyer's SACC identifies five different dates on which the five specific Undisclosed Injuries allegedly took place. Three of these—a shoulder injury suffered on March 18, 2015, a knee injury suffered on April 8, 2015, and a back injury suffered on April 16, 2015—occurred in the time period between February 28, 2015 and the closing of the Sale. In addition to these incidents, the roofing contractor who was injured on March 8, 2015 at Seller's Georgia facility died on March 13, 2015. Thus, three of the Undisclosed Injuries and the Roofing Death occurred after "the Most

Recent Fiscal Month End," as that date was defined by the SPA. Buyer alleges that these incidents were known to Seller and provides facts to support this assertion. For example, Seller's workers' compensation carrier established reserve amounts of $247,848 and $444,051 for the two claims resulting from the April 8 and April 16 Undisclosed Injuries. (SACC ¶ 73.) Additionally, three days after the Roofing Death, Taveira wrote an email to Butsavage stating "We will have to disclose this to [Buyer]." (SACC ¶ 83.) According to Buyer's allegations, however, no disclosure was ever made.

64. Viewed in the light most favorable to Buyer, the above-described facts could cause a fact finder to reasonably conclude that Ruggiero and Taveira, after a reasonable inquiry, would have anticipated a "Proceeding" of some kind being brought against one of the A&D Companies—indeed, in the case of the Roofing Death, a wrongful death claim was eventually filed against A&D's Georgia subsidiary.[6] Consequently, as pleaded, a fact finder could also reasonably conclude that the representation contained in section 4.4(m)—that no Proceedings against the A&D Companies were anticipated—was contradicted by Taveira's and Ruggiero's alleged knowledge of the Undisclosed Injuries and Roofing Death and the facts surrounding those incidents. Thus, section 4.4(m) would not have told Buyer the whole truth, and

---

[6] The Tillery Movants argue that it is "untenable for Buyer to claim that a Proceeding would be anticipated" as a result of the Roofing Death because "the incident was not reported to Seller's workers' compensation insurance[,] . . . was not OSHA recordable," and did not involve an employee of Seller, and because of these factors it did not impact Seller's EMR or TRIR. (Mem. Further Supp. Mot. Dismiss Second Am. Countercl. & Third-Party Compl. Pl. and Countercl. Def. Tillery Envtl. LLC & Third-Party Defs. Chris Weidenhammer, Paul Taveira, and John Ruggiero 9, ECF No. 88.) Section 4.4(m), however, makes no reference to EMR or TRIR and is not limited to Proceedings originating from employees of the A&D Companies.

an obligation would have been created to speak fully on these matters. *See Ragsdale*, 286 N.C. at 139, 209 S.E.2d at 501.

65.    Buyer also argues that section 4.4(n) of the SPA required a full and fair disclosure that should have revealed the Undisclosed Injuries. Section 4.4(n) provided: "Since [February 28, 2015] . . . to the Company's Knowledge, with respect to any A&D Company, there has not been any Material Adverse Effect[.]" (SPA § 4.4(n).) The SPA defined Material Adverse Effect as "any event, condition, effect, change, or development of a set of circumstances or facts that . . . has a material adverse effect on the business, assets or proprieties of the A&D Companies, taken as a whole, after taking into effect any insurance recoveries[.]" (SPA 7.) Buyer asserts that section 4.4(n) required the Tillery Movants to disclose the Undisclosed Injuries because Buyer's ignorance of these incidents caused Buyer to overvalue the A&D Companies and did not allow Buyer to fully evaluate the desirability of purchasing A&D.

66.    The Tillery Movants make several arguments asserting that section 4.4(n) did not require the disclosure of the Undisclosed Injuries, but the Court finds each without merit. For example, the Tillery Movants argue Buyer has failed to plead that a Material Adverse Effect occurred because it did not allege that the Undisclosed Injuries were not covered by insurance. They also argue that Buyer has alleged no facts showing that an actual adverse effect has occurred, such as the termination of one of A&D's contracts. These, and the rest of the Tillery Movants' contentions, ignore the actual thrust of Buyer's argument—that A&D's future business prospects

were far less certain than Buyer was led to believe they were, and as a result, Buyer paid an inflated price for A&D's shares.

67. Buyer's allegations, if true, would permit a finder of fact to reasonably conclude that a Material Adverse Effect had indeed occurred between February 28, 2015 and the date the Sale closed, despite Seller's representations in the SPA to the contrary. In A&D's industry, future business, profitability, and value are tied to maintaining certain safety ratings. (*See* SACC ¶ 28.) Events that cause safety ratings to rise to unacceptable levels would make A&D less valuable and an acquisition of A&D's shares less desirable. (*See* SACC ¶ 28.) In other words, such events could reasonably be found to have "a material adverse effect on the business . . . of the A&D Companies." (SPA 7.) The pleaded facts suggest that Seller was well aware of this dynamic. In a March 18, 2015 email from Taveira to company management personnel, Taveira wrote:

> The reason we are in the dilemma we are in with [customer Georgia Pacific] is, [sic] because the NC safety record is horrendous. Our EMR, TRIR, OHSA [sic] citations and [Georgia Pacific] low grades post-work evaluations are a direct result of our safety record in NC. *At this rate, it won't matter how many hours we work because we will not have business.*

(SACC ¶ 53 (emphasis added).)

68. At the motion to dismiss stage, taking the facts in the light most favorable to Buyer, the Court concludes that Buyer's SACC provides facts that show that the representation made in section 4.4(n) was false and contradicted by the fact that the Undisclosed Injuries would soon contribute to a significant, unfavorable increase in A&D's safety ratings and thus place significant business at risk. Therefore, Buyer

has successfully alleged section 4.4(n) created a duty to make a full and fair disclosure of facts about the Undisclosed Injuries. *See Ragsdale*, 286 N.C. at 139, 209 S.E.2d at 501 (summary judgment inappropriate when corporate president had knowledge of the fact the corporation had lost money, but represented it as a "gold mine" and a "going concern"); *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 437–38, 617 S.E.2d 664, 671 (2005) (reversing summary judgment for defendant on fraud claim following *Ragsdale* when defendant made misleading statements about the current demand for builders in certain subdivisions).

69. The Tillery Movants attempt to short-circuit this analysis, and avoid liability arising from the representations made in Article IV of the SPA, by arguing that Article IV expressly provides that its representations are made by "the Company," i.e., pre-Sale A&D, i.e., Seller. As a result, the Tillery Movants argue, they cannot be liable for any fraud originating from these representations. This contention requires the Court to examine whether the Tillery Movants, even if aware that the representations in sections 4.4(m) and 4.4(n) did not constitute a full and fair disclosure of the matters those sections discussed, are nonetheless insulated from liability because the SPA specified the representations in sections 4.4(m) and 4.4(n) were made by "the Company" as opposed to the selling shareholders. The Court concludes that the answer to this question must be no.

70. To the Court's knowledge, no North Carolina court has had occasion to examine the issue of a corporate officer's liability for fraud when the allegedly fraudulent statements are made within a contract and attributed solely to the

corporation by that same contract. Thus, there is no North Carolina case on all fours with the one now before the Court. Seeking guidance, the Court considers the principles of law underlying the American corporate form, North Carolina law governing the tort liability of corporate officers, and two Delaware Chancery Court opinions on this issue.[7]

71. It is well settled in the United States that "a corporation is an artificial being, invisible, intangible, and existing only in contemplation of law." *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819). It is likewise axiomatic that a corporation, having no body, voice, or other means of interacting with the corporeal world, must rely on agents of the less-theoretical sort to transact its business—typically directors, officers, and employees. *Braswell v. United States*, 487 U.S. 99, 110 (1988); *see Burlington Indus., Inc. v. Foil*, 284 N.C. 740, 758, 202 S.E.2d 591, 603 (1974).

72. When addressing questions of liability that inevitably arise from this agency relationship, North Carolina courts have long recognized the following general rule: a corporation's agent "is not liable for the torts of the corporation 'merely by virtue of his office'" but is personally liable "'for torts in which he actively participates,' even though [those torts are] 'committed when acting officially.'" *Taft v. Brinley's Grading Servs.*, 225 N.C. App. 502, 520, 738 S.E.2d 741, 752 (2013) (quoting *Wolfe v. Wilmington Shipyard, Inc.*, 135 N.C. App. 661, 670, 522 S.E.2d 306, 312–13 (1999));

---

[7] While the decisions of the Delaware Chancery Court have no binding authority on this Court, this Court has frequently found the Chancery Court to be a "persuasive authority on various issues of business and corporate law." *McMillan v. Unique Places, LLC*, 2015 NCBC LEXIS 49, at *8 (N.C. Super. Ct. May 7, 2015).

*see also Palomino Mills, Inc. v. Davidson Mills Corp.*, 230 N.C. 286, 292, 52 S.E.2d 915, 919 (1949) ("[I]t is thoroughly well settled that a man is personally liable for all torts committed by him, consisting in misfeasance, as fraud, conversion, acts done negligently, etc., notwithstanding he may have acted as the agent or under directions of another . . . this is true to the full extent as to torts committed by officers or agents of a corporation in the management of its affairs . . . the fact that the circumstances are such as to render the corporation liable is altogether immaterial . . . ." (quoting *Minnis v. Sharpe*, 198 N.C. 364, 367, 151 S.E. 735, 737 (1930))). The Court must now determine if this general rule applies equally in this case, where an agreement between the parties identified the corporation as the sole source of the allegedly fraudulent representations.

73. The Delaware Chancery Court has previously addressed this issue. In *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006), the Chancery Court concluded that a seller could be liable for a sold company's contractual representations in certain situations:

> [T]he public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be rescinded if the Buyer can show either: 1) that the Seller knew that the Company's contractual representations and warranties were false; or 2) that the Seller itself lied to the Buyer about a contractual representation and warranty. This will require the Buyer to prove that the Seller acted with an illicit state of mind, in the sense that the Seller knew that the representation was false and either communicated it to the Buyer directly itself or knew that the Company had.

*Id.* at 1064.

74. The Chancery Court examined this issue again in *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35 (Del. Ch. 2015). Like in the case before this

Court now, the dispute in *Prairie Capital III, L.P.* arose following a stock purchase agreement when the purchaser delayed the dispersal of escrow funds and brought counterclaims against the sellers for fraudulent representations in the stock purchase agreement. *Id.* at 43. Several of the sellers responded by contending that "they [could not] be accountable for any of the representations because they were made only by the Company." *Id.* at 59.

75.     The Chancery Court in *Prairie Capital III, L.P.* declined to adopt the sellers' reasoning, explaining that a corporation has "no mind with which to think, no will with which to determine and no voice with which to speak," and this means a corporation can only "act through human agents." *Id.* at 59–60 (quoting *N. Assurance Co. v. Rachlin Clothes Shop*, 125 A. 184, 188 (Del. 1924)). These agents, the court continued, cannot escape personal liability for the corporation's fraudulent actions when they have actively participated in the fraud. *Id.* at 60 (citing *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658-VCS, 2009 Del. Ch. LEXIS 54, at \*44 (Del. Ch. Apr. 20, 2009)). In keeping with the holding of *ABRY Partners V, L.P.*, the court concluded that these principles meant the sellers could indeed be liable "for fraudulent contractual representations made by the Company because the [purchaser] sufficiently allege[d] that [the sellers] knew that the representations [in the stock purchase agreement] were false." *Id.* at 61. The purchaser also sufficiently alleged that the sellers actively participated in making the false representations by pleading facts showing that the sellers, among other things, "monitored and directed the Company's day to day business activities," were involved in the approval of "all

documents and reports before anything was sent to [the purchaser]," and "communicated directly with [the purchaser] on a regular basis throughout the sales process, both during formal presentations and informal dinner meetings." *Id.* The Chancery Court concluded that these alleged facts were sufficient to support the purchaser's claim for fraud. *See id.* at 61–62.

76. The Court finds that these Delaware opinions offer not only a persuasive argument for the correct decision in this case, but also a satisfactory blueprint for deciding this issue based on recognized North Carolina law. There appears to be no precedent in North Carolina supporting the enforcement of a contractual provision exculpating an individual from intentional wrongdoing. *See Ada Liss Grp. v. Sara Lee Corp.*, No. 06CV610, 2010 U.S. Dist. LEXIS 59691, at *27 (M.D.N.C. Apr. 28, 2010) ("There is absolutely no case law in North Carolina, on either the state or federal level, supporting the enforcement of exculpatory clauses for intentional wrongdoing.") As one federal district court in North Carolina has noted, this is likely because "the issue is . . . obviously contrary to sound law and policy[.]" *Id.* at *28 (citing *Restatement (Second) of Contracts* § 195 (Am. Law Inst. 1981)). But if the Court were to agree with the Tillery Movants' argument here, its decision would effectively exculpate them from any liability for Seller's alleged misrepresentations in the SPA, even if they played a part in making those misrepresentations. The only entity that could be liable for the misrepresentations under this line of reasoning would be A&D, the entity now owned by Buyer. Such an outcome would be inconsistent with North Carolina law.

77.     The SPA may have expressly provided that the representations in sections 4.4(m) and 4.4(n) were made by Seller, but Seller, a corporate entity, had no voice of its own to speak with and no hand of its own to write with.  It was totally dependent on its officers and other agents to negotiate the terms of the SPA and make the representations contained in the SPA.  If false or misleading statements were made, they were necessarily made by one or more of Seller's agents.  If facts pertinent to representations made by Seller were withheld, they were necessarily withheld by one or more of Seller's agents.  The law in North Carolina mandating liability for Seller's torts is clear: a corporate agent who actively participates in a corporate tort is personally liable for that tort.  *See, e.g.*, *Wilson v. McLeod Oil Co.*, 327 N.C. 491, 518, 398 S.E.2d 586, 600 (1990); *Lillian Knitting Mills Co. v. Earle*, 233 N.C. 74, 76, 62 S.E.2d 492, 493 (1950) ("[C]orporate directors and officers are personally liable for making fraudulent misrepresentations of fact as to the financial condition of the corporation to persons who deal with the corporation and suffer loss by reason of their reliance on such misrepresentations."); *Minnis*, 198 N.C. at 367, 151 S.E. at 737; *Taft*, 225 N.C. App. at 520, 738 S.E.2d at 752; *White v. Collins Bldg., Inc.*, 209 N.C. App. 48, 56, 704 S.E.2d 307, 312 (2011) (holding that the president of a corporation could be personally liable for negligence without piercing the corporate veil); *Esteel Co. v. Goodman*, 82 N.C. App. 692, 698, 348 S.E.2d 153, 157 (1986) (holding the evidence at trial supported finding a corporation's president liable for conversion when he participated in selling leased property on which an option to purchase had not been exercised); *Wolfe*, 135 N.C. App. at 670, 522 S.E.2d at 313.

78. The Court thus concludes that if the Tillery Movants actively participated in making the representations in sections 4.4(m) and 4.4(n) of the SPA with knowledge that a full and fair disclosure of the matters addressed by those sections had not been provided to Buyer, the SPA's language will not insulate the Tillery Movants from a claim for fraud based on those sections.

79. At this stage of the case, Buyer's pleaded facts would permit a fact finder to reasonably conclude that the Tillery Movants were aware the representations in sections 4.4(m) and 4.4(n) were misleading when made to Buyer but participated in making those representations anyway. Buyer alleges that Tillery, Weidenhammer, Taveira, and Ruggiero all knew of the Undisclosed Injuries and Roofing Death before closing, and Buyer's pleaded facts also show that each of the Tillery Movants played an important role in the negotiation and implementation of the SPA. Weidenhammer signed the SPA as Seller's president, was involved in the due diligence disclosures with Buyer, and served as a manager of Tillery. Tillery served as the shareholders' representative for the SPA and Sale, employed Weidenhammer as its agent, and owned a majority of Seller's shares. Taveira and Ruggiero were both officers of Seller, and Seller's representations in sections 4.4(m) and 4.4(n) were made by reference to Taveira's and Ruggiero's knowledge after a reasonable inquiry.

80. Furthermore, based on Buyer's allegations, a reasonable fact finder could conclude that by causing Seller to sign the SPA, by actively participating in the production of due diligence information to Buyer, by allowing Seller to define its knowledge by their knowledge, by selling their own shares to consummate the

transaction, and by allegedly doing so while knowing their actions would cause Seller to make representations to Buyer that left out material information, the Tillery Movants actively participated in making the misrepresentations in the SPA. Because Seller made the representations in sections 4.4(m) and 4.4(n), it "incurred a concomitant duty to make a full disclosure of any extenuating . . . circumstances which counteracted [those] positive assertions" and is thus potentially liable to Buyer for fraud. *Ragsdale*, 286 N.C. at 139, 209 S.E.2d at 501. Consequently, under Buyer's pleaded facts, the Tillery Movants are liable as well.

81. Finally, the Tillery Movants also argue Buyer's allegations involving the Undisclosed Injuries and Roofing Death are conclusory and ambiguous and thus fail to state a claim. The Court does not agree.

82. Buyer has sufficiently pleaded a claim for fraud based on the Undisclosed Injuries and Roofing Death at this stage of the case. First, as indicated above, Buyer has pleaded facts giving rise to a duty to make a full and fair disclosure.

83. Second, Buyer has met the other requirements for alleging a claim for fraudulent concealment at this stage of the case. Buyer alleges the general content of the information that should have been disclosed, the identity of the individuals who knew the information and failed to disclose it, what those individuals gained from withholding the information, and that Buyer was damaged as a result of the concealment when Buyer paid more for A&D than the corporation was truly worth. Even if Buyer's allegations concerning knowledge and intent are general, such allegations meet the requirements of Rule 9(b). N.C. R. Civ. P. 9(b). The

reasonableness of Buyer's conduct is a question the Court cannot decide now as a matter of law. *See Forbis*, 361 N.C. at 527, 649 S.E.2d at 387; *Johnson*, 263 N.C. at 758, 140 S.E.2d at 314. Consequently, Buyer's claim for fraud against the Tillery Movants premised on the concealment of the Undisclosed Injuries and Roofing Death should survive the Tillery Motion.

### 3. Affirmative Misrepresentations

84. The second prong of Buyer's fraud claim rests on alleged affirmative misrepresentations made to Buyer—the "false and misleading due diligence information" concerning Seller's 2012, 2013, and 2014 EMR numbers. (SACC ¶ 111.) Buyer asserts that the Tillery Movants produced or caused Seller to produce this information to Buyer, that Buyer could not have known the information was false through due diligence, and that as a direct result of receiving fraudulent information Buyer ended up paying too much for Seller's shares.

85. The Tillery Movants respond to Buyer's claims based on Seller's 2012–14 EMR information by making two main arguments. First, they argue that Buyer has failed to plead that its reliance on Seller's EMR numbers was reasonable. Second, the Tillery Movants assert that Buyer has not established that Seller's practice of "buying down" its EMR each year was improper, and thus Buyer has failed to state a claim as a matter of law. The Court disagrees with both of these assertions but agrees that Buyer has failed to plead facts that give rise to an inference of knowledge, intent, or reckless disregard on the part of Ruggiero with regard to Seller's 2012–14 EMR disclosures.

86. The Tillery Movants' first argument asserts Buyer has failed to establish that its reliance on the 2012–14 EMR figures was reasonable because the EMR data provided to Buyer showed two years in which Seller's EMR rose above 1.0. As a result, the Tillery Movants argue that Buyer should have been put on notice that further due diligence on Seller's EMR was required. Because Buyer could have discovered the truth about Seller's EMR numbers upon inquiry, they continue, the law requires Buyer to plead that it was denied the opportunity to investigate or that it could not have learned the true facts by exercising reasonable diligence—something the Tillery Movants claim Buyer did not do. The Court does not find this argument persuasive.

87. It is true that to succeed on a claim for fraud by affirmative representation a claimant's "reliance on alleged false representations must [have been] reasonable." *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011). It is also true that reliance on false representations "is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Id.*; *WNC Holdings, LLC v. All. Bank & Tr. Co.*, 2012 NCBC LEXIS 53, at *36 (N.C. Super. Ct. Oct. 2, 2012). But courts faced with arguments similar to those propounded here, e.g., "Buyer Caused its Own Harm by Not Conducting Additional Due Diligence," (Tillery Movants' Support Brief 13), must also remember the unambiguous rule expressed by the Supreme Court of North Carolina: "the maxim *caveat emptor* does not apply in cases of fraud," *Johnson*, 263 N.C. at 758,

140 S.E.2d at 314 (quoting *Brooks v. Ervin Constr. Co.*, 253 N.C. 214, 217, 116 S.E.2d 454, 457 (1960)).

88. The doctrine of reasonable reliance enforces the notion that "[a] plaintiff who, aware, has made a bad bargain should not be allowed to disown it," but when courts are presented with a close case, "a [party] who has intentionally made a false representation about something material . . . should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you.'" *Id.* Because the facts are of the utmost importance in these cases, "[c]ourts should be very loath to deny an actually defrauded [claimant] relief on" the grounds that his or her reliance was unreasonable. *Id.* Thus, unless "the facts [as alleged] are so clear that they support only one conclusion," the reasonableness of a party's reliance is a question of fact. *Forbis*, 361 N.C. at 527, 649 S.E.2d at 387.

89. The Court does not believe the reasonableness of Buyer's reliance can be determined at this stage of the case. The Court cannot conclude here that Buyer should have known to conduct due diligence into the accuracy of Seller's previous EMR numbers simply because the altered numbers rose above 1.0 in two years before the SPA was executed. The Court will not guess why Buyer chose to go forward with the SPA after seeing this information. Perhaps Buyer decided two abnormally high years were not cause for alarm; perhaps it had other motivations. But even assuming that after viewing Seller's disclosed EMR figures Buyer should have been aware that Seller's "consistently below 1.0" language was puffery, it does not follow that Buyer

should have also suspected that Seller's EMR figures themselves were inaccurate and manipulated.

90. The Court is also skeptical of the Tillery Movants' argument that Buyer could have discovered the truth of these matters via further inquiry. No agent of Seller provided Buyer with facts about Seller's practice of "buying down" Seller's EMR in previous years when Buyer asked for information about Seller's EMR history. The Court will not punish Buyer for failing to ask Seller if the EMR figures Seller provided were calculated accurately and without manipulation. *See Johnson*, 263 N.C. at 758, 140 S.E.2d at 314 ("The law does not require a prudent man to deal with everyone as a rascal and demand covenants to guard against the falsehood of every representation which may be made as to facts which constitute material inducements to a contract; that there must be a reliance on the integrity of man or else trade and commerce could not prosper." (quoting *Cowart v. Honeycutt*, 257 N.C. 136, 143, 125 S.E.2d 382, 387 (1962))); *Freese*, 110 N.C. App. at 35, 428 S.E.2d at 846 ("[I]f a seller does speak then he must make a full and fair disclosure of the matters he discloses.").

91. What is more, in contradiction to the Tillery Movants' assertions, Buyer has in fact pleaded that "Buyer could not have known of the falsity of the misleading statements through the exercise of diligence as the relevant information was in the exclusive control of Seller Corporation" and the Tillery Movants. (SACC ¶ 112.) Buyer's pleaded facts also demonstrate that Seller's allegedly improper actions resulted in NCCI, the national group that calculated and set businesses' EMRs, changing Seller's EMR figures for 2012–14. A fact finder could thus reasonably

conclude that Seller's practice of altering its EMR figures after the fact would have been difficult to discover. The Court therefore finds that Buyer has sufficiently pleaded its reasonable reliance on the 2012–14 EMR figures to satisfy the requirements of Rule 12(b)(6). *See Forbis*, 361 N.C. at 527, 649 S.E.2d at 387; *Phelps-Dickson Builders, L.L.C.*, 172 N.C. App. at 439, 617 S.E.2d at 671 (holding the plaintiff's fraud claims were "not barred on the grounds that plaintiff had some lesser opportunity to investigate the various representations made by [defendant], who possessed superior knowledge on such matters" when those representations "could not be readily or easily verified"); *Flanders/Precisionaire Corp. v. Bank of N.Y. Mellon Tr. Co.*, 2015 NCBC LEXIS 36, at *36 (N.C. Super. Ct. Apr. 7, 2015) (holding that a plaintiff had sufficiently pleaded reasonable reliance when its complaint stated that it "was not privy to the information which would have allowed it to understand the nature of [a contract]" and the plaintiff's responsibilities under the contract and that plaintiff would not have entered the transaction had it known the true facts).

92. The Tillery Movants' second argument—that Buyer has not sufficiently established the impropriety of Seller's "buying down" its EMR and has pleaded only conclusory facts on this point—also embraces questions of fact that the Court cannot now determine. The question posed by the Tillery Motion is whether Buyer's allegations about Seller's 2012–14 EMR disclosures support a claim for fraud, assuming for now that the allegations are true and taking into account the particular pleading requirements of Rule 9(b). The Court concludes that they do.

93. While it is true that the particularity requirements of Rule 9(b) cannot be satisfied by using "conclusory language or asserting fraud through mere quotes from the statute," the Supreme Court of North Carolina has stated that a claimant pleading actual fraud meets Rule 9(b)'s pleading standard "by alleging [the] time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981). Rule 9(b) requires a claimant to plead with greater particularity to protect defendants from "unjustified injury to . . . reputation" and provide them with particular facts "in order to meet the charges" of fraud brought against them. *Id.* Buyer's pleaded facts provide the Tillery Movants with such information and are sufficient under this standard.

94. Buyer has alleged when and how the 2012–14 EMR numbers were produced by Seller. Buyer has also alleged the identities of individuals responsible for producing the numbers and the result of the allegedly fraudulent acts—Buyer's overpayment. Buyer's assertion that Seller's practice of "buying down" EMR numbers was "neither accepted as an industry practice, nor sanctioned by NCCI as a permissible method of managing EMR," (SACC ¶ 66), is another fact Buyer pleads to support its claim for fraud—a fact that may weigh on whether the 2012–14 EMR figures were false or misleading, whether the Tillery Movants possessed an intent to deceive, or whether Buyer's reliance was reasonable. Whether Buyer's claims are supported by sufficient factual evidence is a question that must be left to a later stage of the case. *Compare Christenbury Eye Ctr., P.A.*, 802 S.E.2d at 891 (stating that

courts treat allegations within pleadings as true when determining whether to grant a Rule 12(b)(6) motion to dismiss), *with Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 334, 777 S.E.2d 272, 278 (2015) (noting that a movant is entitled to summary judgment "where a claim or defense is utterly baseless in fact"). For now, Buyer's pleaded facts allow its claim for fraud based on the 2012–14 EMR figures to survive the Tillery Motion.

95. Finally, for the reasons discussed above in relation to the concealment of Seller's 2015 EMR, the Court concludes that Buyer has sufficiently pleaded a claim against Tillery, Weidenhammer, and Taveira for fraud premised on Seller's 2012–14 EMR figures but has failed to plead specific facts that "provide a 'tie-in'" between Ruggiero and the allegedly misleading information given to Buyer for the years 2012–14. *Oberlin Capital, L.P.*, 2000 NCBC LEXIS 8, at *16; *see also Worley*, 2017 NCBC LEXIS 15, at *73–74. No pleaded facts show Ruggiero was involved in any manner in manipulating Seller's EMR information or in producing the EMR disclosures to Buyer. Thus, Buyer's fraud claim against Ruggiero cannot be premised upon the 2012–14 EMR information provided to Buyer.

96. In conclusion, Buyer's fraud claim based on Seller's allegedly misleading 2012–14 EMR numbers is sufficiently pleaded against Tillery, Weidenhammer, and Taveira but not Ruggiero. Given that Buyer has now asserted its counterclaims three separate times, Buyer's claim for fraud based on the 2012–14 EMR figures is dismissed against Ruggiero with prejudice.

B.    Buyer's Alternative Claim Under the North Carolina Securities Act

97.    In the alternative, Buyer brings a claim against the Tillery Movants for violations of the NCSA.  The NCSA regulates transactions involving "securities," which are defined as:

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement . . . investment contract . . . or, in general, any interest or instrument commonly known as a "security[.]"

N.C. Gen. Stat. § 78A-2(11).  "The NCSA recognizes three different categories of [potentially liable] persons and approaches liability against these different persons from different perspectives and with different allocations of the burden of proof." *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *28.  These approaches to liability include primary liability against certain persons under section 78A-56(a), secondary liability for persons described in section 78A-56(c)(1), or secondary liability for those not included under section 78A-56(c)(1).  *Id.* at *29.  As a general rule, the NCSA does not impose a duty to disclose on parties.  *Id.* at *62–63.  Buyer asserts that it has properly stated a claim under the NCSA for primary liability against Tillery, Taveira, and Ruggiero and for secondary liability against Weidenhammer, Taveira, and Ruggiero.[8]

---

[8] Buyer's SACC generally asserts that Tillery, Weidenhammer, Taveira, and Ruggiero "violated the North Carolina Securities Act" and buttresses this assertion with various alleged facts.  (SACC ¶¶ 117–29.)  The pleading does not explain what particular provision of the NCSA gives rise to the Tillery Movants' liability.  It appears to the Court from representations and arguments made in Buyer's brief that Buyer claims Tillery, Taveira, and Ruggiero are subject to primary liability under the NCSA and Weidenhammer, Taveira, and Ruggiero are subject to secondary liability.  The Court thus addresses Buyer's claims as they are framed in Buyer's brief, and to the extent the allegations in the SACC can be read more broadly, the Court concludes that Buyer—after now asserting its counterclaims for the third

1. Primary Liability Under the NCSA

98.    Sections 78A-56(a)(1) and 78A-56(a)(2) provide two grounds for holding persons primarily liable under the NCSA.  A person who offers or sells a security and violates either of these sections "is liable to the person purchasing the security from him, who may sue either at law or in equity to recover" certain remedies.  N.C. Gen. Stat. § 78A-56(a).  Here, Buyer has properly pleaded a claim for primary liability against Tillery, Taveira, and Ruggiero under either subsection.

99.    Section 78A-56(a)(1) imposes liability on persons who offer or sell "a security in violation of [sections] 78A-8(1) [or] 78A-8(3)[.]"  N.C. Gen. Stat. § 78A-56(a)(1).  In effect, this liability is "similar to common law fraud." *Piazza v. Kirkbride*, 785 S.E.2d 695, 709 (N.C. Ct. App.), *petition for disc. review granted*, 794 S.E.2d 316 (N.C. 2016). As a result, a claimant seeking to hold a person liable under subsection (a)(1) must include in their pleading allegations and facts sufficient to state a claim for common law fraud. *Id.*  Because the claim is based in fraud, it must comply with Rule 9(b). *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *35.  Stated differently, to successfully state a claim under subsection (a)(1):

> a plaintiff must plead with particularity that (1) defendant is a seller or offeror of a security who either (a) "employ[ed] any device, scheme, or artifice to defraud," or (b) "engage[d] in any act, practice, or course of business which

---

time—has abandoned any NCSA claim against any other defendant or any alternative NCSA claims against these defendants.  The Court dismisses such other claims with prejudice. *See Thompson Installations, Inc. v. Stock Bldg. Supply, LLC*, 2012 NCBC LEXIS 12, at *15 (N.C. Super. Ct. Feb. 21, 2012) (deeming a cause of action abandoned when the plaintiff asserted general liability under a chapter of the North Carolina General Statutes but "failed to plead or otherwise raise" liability under a specific section of the chapter); *see also Blythe v. Bell*, 2013 NCBC LEXIS 7, at *32 (N.C. Super. Ct. Feb. 4, 2013) (dismissing or limiting contract claims by the plaintiff as a result of his choice not to pursue certain claims).

operates or would operate as a fraud or deceit upon any person"; (2) defendant acted with scienter; and (3) plaintiff justifiably relied.

*Id.* at *35–36.

100.  In the instant case, Buyer has properly pleaded a claim for fraud against three parties that sold Buyer securities—Tillery, Taveira, and Ruggiero—by way of the previously discussed allegations involving concealed facts and affirmative misrepresentations.  As a result, Buyer has stated a claim for civil liability under section 78A-56(a)(1) against these three parties.

101.  As an alternative route to primary liability under the NCSA, section 78A-56(a)(2) imposes liability on an offeror or seller of a security who makes a false or misleading statement about a material fact or makes a statement about a material fact that was false or misleading under the circumstances because of an omission. N.C. Gen. Stat. § 78A-56(a)(2); *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *37–39.  A successful claim under this subsection requires allegation and proof (i) that a false or misleading statement was made, (ii) that the statement was material, and (iii) that the statement "was made by one who offered or sold a security."  *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *39. Unlike a claim for common law fraud or liability under subsection (a)(1), subsection (a)(2) does not require proof of scienter or justifiable reliance.  *Id.* at *37; *see* N.C. Gen. Stat. § 78A-56(a)(2).  A claim under this subsection may be grounded on fraud or negligence, and when it is based on negligence, "[t]he heightened pleading standards of Rule 9(b) do not apply[.]  *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *38.  The logical inverse of this statement is that the standards

of Rule 9(b) will apply to a subsection (a)(2) claim based on fraud. This point is largely extraneous here, however, because the Court has determined that Buyer's allegations are sufficiently specific.

102. Like with its claim for primary liability under subsection (a)(1), Buyer's previously discussed allegations of fraud also serve to state a claim for primary liability under subsection (a)(2). Buyer's allegations about Seller's 2012–14 EMR figures show one set of false or misleading material statements made to Buyer. The alleged misrepresentations made in the SPA are an example of another. Thus, Buyer has sufficiently stated a claim under section 78A-56(a)(2) against Tillery, Taveira, and Ruggiero to withstand a motion to dismiss.

### 2. Secondary Liability Under the NCSA

103. In addition to allowing civil suits against those liable under section 78A-56(a), the NCSA also provides for what has been termed "secondary liability" under section 78A-56(c). *Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *17 (N.C. Super. Ct. Feb. 27, 2015); *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *39–40. To bring a successful claim for secondary liability, a claimant must first plead a primary violation of the NCSA. *Atkinson*, 2015 NCBC LEXIS 21, at *17 ("If Plaintiffs can prove that an offeror or seller has primary liability . . . secondary liability will lie for [the individuals listed in section 78A-56(c)(1).]"); *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *41–42 ("To bring a claim for [secondary] liability under § 56(c)(1) or (2), a plaintiff must first plead a primary violation under § 56(a), (b), or (b1) . . . .").

104. Secondary liability under the NCSA allows a claimant to recover from a broadly defined group of persons besides the primarily liable offeror or seller, and section 78A-56(c) enumerates those who may be secondarily liable as follows:

(1) Every person who directly or indirectly controls a person liable under subsection (a), (b), or (b1) of this section, every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the sale is also liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(2) Unless liable under subdivision (1) of this subsection, every employee of a person liable under subsection (a), (b), or (b1) of this section who materially aids in the transaction giving rise to the liability and every other person who materially aids in the transaction giving rise to the liability is also liable jointly and severally with and to the same extent as the person if the employee or other person actually knew of the existence of the facts by reason of which the liability is alleged to exist.

N.C. Gen. Stat. 78A-56(c). When determining whether a pleading sufficiently alleges that a person materially aided a transaction for the purposes of a motion to dismiss, this Court has previously required "allegations of conduct which rises to the level of having contributed substantial assistance to the act or conduct leading to primary liability under the NCSA." *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *49.

105. Although both subsections of 78A-56(c) extend liability to a potentially broad group of persons, the allegations required to plead a claim under each are slightly different. A claimant states a claim under subsection (c)(1) by (i) stating a claim for primary liability and (ii) pleading facts that show the defendant fits within the category of persons listed in subsection (c)(1). *Id.* In contrast, a claimant stating a

claim under subsection (c)(2) must (i) state a claim for primary liability, (ii) plead facts showing the defendant fits within the category of persons listed in subsection (c)(2), and (iii) plead that the defendant "actually knew of the existence of the facts by reason of which the liability is alleged to exist." *Id.* (quoting N.C. Gen. Stat. § 78A-56(c)(2)).

106.  The Tillery Motion presents two separate questions for the Court.  The first is whether Buyer has properly pleaded a claim against Weidenhammer for secondary liability under the NCSA.  The second is whether Buyer has also done so against Taveira and Ruggiero.  The first question is easy to answer; the second is more difficult.

107.  Buyer has clearly stated a claim for secondary liability against Weidenhammer under either subsection of 78A-56(c).  First, the Court has already concluded that Buyer has stated a claim for primary liability against Tillery.  Second, Buyer has alleged that Weidenhammer was a "member/manager of Tillery," and that he carried out his complained-of conduct "in his capacity as an officer of Tillery." (SACC ¶ 3.)  Buyer has alleged specific ways in which Weidenhammer contributed to the sale of Tillery's shares of Seller, e.g., concealing information from Buyer and signing the SPA on behalf of Seller as its president.  (SACC ¶¶ 45, 71; SPA at Joinder Signature Pages.)  These alleged facts are sufficient to show that Weidenhammer was a "person who directly or indirectly control[led] [Tillery]" as a "partner, officer, or director of [Tillery]," or a "person occupying a similar status or performing similar functions," who materially aided in the sale under subsection (c)(1).  N.C. Gen. Stat.

§ 78A-56(c)(1). These alleged facts also show that Weidenhammer was an "employee of [Tillery] who materially aid[ed] in the transaction" under subsection (c)(2). N.C. Gen. Stat. § 78A-56(c)(2). Finally, Buyer has pleaded Weidenhammer had actual knowledge of the facts by reason of which liability is alleged to exist. (*See e.g.*, SACC ¶¶ 33, 45–46, 111, 114.) Buyer has thus stated a claim against Weidenhammer under subsection (c)(1) and subsection (c)(2).

108. Whether Buyer has properly pleaded a claim for secondary liability against Taveira and Ruggiero requires more analysis. North Carolina law (and analogous federal case law) requires a claim for secondary liability under the NCSA to be preceded by a claim for primary liability. *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *41; *see Venturtech II, L.P. v. Deloitte Haskins & Sells*, 790 F. Supp. 576, 589 (E.D.N.C. 1992) (noting that aiding and abetting a violation of similar federal securities law requires "a primary violation by another person"); *see also Hunt v. Miller*, 908 F.2d 1210, 1213 n.5 (4th Cir. 1990) (comparing the NCSA and federal securities law and noting that section 78A-56(c) "has been interpreted by reference to federal law"). The relationship that must be shown between the primarily liable party and the secondarily liable party differs depending on whether the claim is brought under subsection (c)(1) or subsection (c)(2). *See* N.C. Gen. Stat. § 78A-56(c). The Court will analyze Buyer's claim under each.

109. Section 78A-56(c)(1) attaches liability to two groups of individuals the Court need consider here. First, persons who directly or indirectly control a primarily liable person, or "control persons," and second, partners, officers, and directors of a

primarily liable person, or persons of similar status and function. N.C. Gen. Stat. § 78A-56(c)(1). As noted above, to bring a claim against a person under this provision, the claimant must first state a claim against the primarily liable person. *Id.* (defining secondarily liable individuals by their relationship to the "person liable under subsection (a), (b), or (b1)"). And while identifying partners, officers, directors, or persons of similar status and function can be straightforward, the statute does not provide a manner for determining "who directly or indirectly controls" a primarily liable person.

110. This Court has previously looked to "analogous federal control person liability statutes, such as 15 U.S.C. § 77o, when interpreting [section 78A-56(c)]." *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at *41 (citing *Hunt*, 908 F.2d at 1213 n.5). "Federal courts often invoke a two-part test to determine control person liability" under these federal control person liability statutes: first, the alleged control person must have "exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Atkinson*, 2015 NCBC LEXIS 21, at *30 (quoting *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911–12 (7th Cir. 1994)); *see also Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 354 (4th Cir. 2012) (stating that, when analyzing control, the court is concerned with "the power or potential power to influence and control the activities of a person"); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 661 (E.D. Va. 2000) ("A plaintiff satisfies the control requirement under this

definition by pleading facts showing that the controlling defendant 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.'" (quoting *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996))).

111. Examining Buyer's claim using this two-part test, the Court concludes that Buyer has not sufficiently stated a claim against Taveira or Ruggiero under section 78A-56(c)(1). First, with respect to these two third-party defendants, Buyer has failed to meet the first requirement for secondary liability under 78A-56(c)(1)—a claim for primary liability. Buyer's Third Claim for Relief in the SACC states, "At the time of the purchase and at all relevant times preceding it, Taveira and Ruggiero were shareholders and officers of Seller Corporation, exerted direct and/or indirect control over Seller Corporation, and had knowledge of the Injuries and the EMR Improprieties." (SACC ¶ 120.) Buyer also alleges that Taveira and Ruggiero were officers of Seller. (SACC ¶¶ 4–5.) But even if these facts are true, Buyer overlooks a significant problem with this control person argument—it has not brought a claim against Seller, the controlled person. Without a claim for primary liability against Seller, Buyer cannot hold the individuals who are alleged to have controlled Seller secondarily liable under subsection (c)(1).

112. Perhaps reacting to this problem, Buyer argues in its brief: "[Weidenhammer, Taveira, and Ruggiero] were all officers of Seller Corporation, and were either shareholders or managed [Tillery]. They each exerted direct and/or

indirect control over these entities, and had knowledge of the Undisclosed Injuries and EMR Improprieties." (Mem. Opp'n Countercl. Def. Tillery & Third-Party Defs. Weidenhammer, Taveira and Ruggiero's Mot. Dismiss Second Am. Countercl. & Third-Party Compl. 26, ECF No. 83.) Buyer thus appears to make a vague argument that Taveira and Ruggiero also controlled Tillery in some manner, directly or indirectly, and thus still controlled a primarily liable person.

113. Whether this was Buyer's intent or not, such an argument is unconvincing. Buyer may argue this in its brief, but a motion to dismiss tests the sufficiency of Buyer's pleaded facts. *Feltman v. City of Wilson*, 238 N.C. App. 246, 251, 767 S.E.2d 615, 619 (2014) ("The only purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the pleading against which it is directed." (quoting *Warren v. New Hanover Cty. Bd. of Educ.*, 104 N.C. App. 522, 525, 410 S.E.2d 232, 234 (1991))). The SACC contains no allegation that Taveira or Ruggiero exerted any kind of control over Tillery and contains no pleaded facts showing Taveira or Ruggiero exercised general control over the operations of Tillery or had the power or ability to control Tillery in negotiating and executing the SPA. The SACC also contains no allegations that Taveira or Ruggiero fell into any other category of person listed in 78A-56(c)(1). For these reasons, Buyer fails to state a claim against Taveira and Ruggiero for secondary liability under section 78A-56(c)(1).

114. The group of people potentially liable under 78A-56(c)(2) is broader than those liable under subsection (c)(1). This route to secondary liability renders two groups of people liable to a claimant: (i) every employee of the primarily liable entity

or person who materially aids in the transaction, and (ii) "every other person who materially aids in the transaction giving rise to the liability," so long as the person from either group "actually knew of the existence of the facts by reason of which the liability is alleged to exist." N.C. Gen. Stat. § 78-56(c)(2). As the language suggests, subsection (c)(2) extends secondary liability to persons beyond those individuals who have a defined relationship with the primarily liable person. *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at \*55 (concluding that certain defendants could be liable under 78A-56(c)(2) even though they were not control persons, directors, partners, officers, or employees of the primarily liable person because the plaintiff pleaded facts sufficient to show that the defendants were "other person[s] who materially aid[ed] in the transaction"). Here, this broad category operates to save Buyer's claim.

115. The SACC contains no pleaded facts showing Taveira or Ruggiero to be employees of Tillery—the only potentially primarily liable party besides Taveira or Ruggiero themselves. Thus, Buyer's claim for secondary liability against each relies on Taveira or Ruggiero, respectively, qualifying as any "other person who materially aid[ed] in the transaction" Tillery was involved in and who actually knew about the facts giving rise to liability. N.C. Gen. Stat. § 78A-56(c)(2). Whether either Taveira or Ruggiero actually was such a person will be a question of fact, *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at \*56 (noting the "fact-intensive" nature of these elements), and Buyer's pleaded facts at this point, taken in the light most favorable to Buyer, are adequate to state a claim against both.

116. The SACC and attached documents contain pleaded facts showing that Taveira was involved in the due diligence process between Seller and Buyer. A number of the representations made in the SPA were also framed as being true to the "Company's Knowledge," which was defined by reference to the knowledge of Taveira and Ruggiero. In addition, Buyer has alleged that Taveira and Ruggiero knew that false or misleading statements were being made in the offering or selling of securities in which Tillery was engaged. The Court thus concludes that Buyer has made sufficient allegations concerning Taveira's and Ruggiero's secondary liability under section 78A-56(c)(2) to survive a Rule 12(b)(6) motion to dismiss.

C. <u>Breach of Contract and Indemnification Against Tillery and Third-Party Defendants</u>

117. Buyer also asserts claims for breach of contract and indemnification against all parties except Weidenhammer. These claims are premised on alleged breaches of representations and warranties in Article IV of the SPA. Buyer believes the lack of disclosure concerning the Roofing Death and Undisclosed Injuries and Buyer's inability to collect on the Honeywell and Benesch invoices resulted in breaches of these representations and warranties.[9]

---

[9] The SACC asserts three claims for relief for breach of contract and indemnification: one against Tillery and all shareholder Third-Party Defendants based on breaches of sections 4.3, 4.4, 4.8, 4.11, 4.13, and 4.21 of the SPA; and two against Tillery based on breaches of sections 4.3 and 4.8. (SACC ¶¶ 97–109, 130–45.) Based on the SACC and Buyer's arguments in its brief and at the October 24 hearing, the Court concludes that the facts and arguments underlying these claims overlap completely. Therefore, notwithstanding Buyer's decision to draw a distinction between these claims in the SACC, the Court will, where applicable, discuss the facts and arguments underlying Buyer's three claims for breach of contract and indemnification together.

118. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015). In this case, the SACC sufficiently alleges, and the parties do not dispute, that a valid contract existed. Instead, the parties disagree over whether the contract was breached and whether Buyer's pleading sufficiently states a cause of action against certain Third-Party Defendants.

119. The SPA, attached to Buyer's pleading and incorporated therein, states that it was executed on May 8, 2015. Section 7.2 of the agreement, entitled "Indemnification by the Shareholders," provided that the shareholders of Seller would indemnify Buyer in certain circumstances, including if certain representations and warranties were breached or were inaccurate:

> After the Closing, subject to the terms and conditions of this Article VII, each Shareholder severally (and not jointly), pro rata based upon each Shareholder's Allocation Percentage, shall indemnify and hold harmless the Buyer . . . for all Losses incurred or suffered, directly or indirectly, relating to or arising from . . . any breach or inaccuracy of any representation or warranty made by the Company in Article IV . . . .

(SPA § 7.2(b).) Section 7.4 of the SPA placed certain maximum and minimum limits on this indemnification obligation. Notably, a breach of the representations and warranties made in Article IV had a maximum indemnification limit of $2.6 million and required a minimum aggregate loss of $260,000. (SPA § 7.4(a).) A claim based on fraud had no minimum, but the maximum amount recoverable for a fraud claim was limited to the purchase price. (SPA § 7.4(a).) The $2.8 million set aside by the

Escrow Agreement was meant to provide for claims based on breaches of the representations and warranties.

120. The shareholders' obligation to indemnify Buyer did not continue indefinitely. Instead, section 7.1 of the SPA provided that the indemnification obligation, and the underlying representations and warranties, survived until 5:00 PM on the Escrow Agreement termination date—November 8, 2016. (SPA § 7.1(a); *see* SACC Ex. 27, at 2.) If Buyer provided proper notice of a claim by that date, the representation and warranty to which the claim related, and the indemnity obligation linked to that representation and warranty, would survive until the claim was resolved. (SPA § 7.1(c).) To recover against the amount in escrow, Buyer also needed to provide proper notice to the escrow agent and Tillery that Buyer intended to make a claim against those funds. The Escrow Agreement required this notice to be a "written demand to Escrow Agent and to [Tillery] setting forth in reasonable detail the basis of such Claim and the amount sought to be paid from the Escrow Fund." (Escrow Agreement 2.)

121. In light of these foundational terms of the SPA and Escrow Agreement, the Court must determine whether Buyer has sufficiently alleged a breach of the SPA entitling Buyer to indemnification under the terms described above. On this point, Tillery and Third-Party Defendants, except for Weidenhammer (collectively, "Movants"), make the following procedural and substantive arguments: (i) Buyer's allegations against the McManus Movants and Butsavage Movants do not satisfy Rule 8, (ii) Buyer has not pleaded facts showing the McManus Movants or the

Butsavage Movants have a duty to indemnify Buyer, (iii) Buyer has failed to plead facts showing the warranties and representations in the SPA were breached or were misleading, and (iv) Buyer's claims are barred by the terms of the SPA and Escrow Agreement. The Court addresses each argument in turn.

    1.   <u>Buyer's Pleaded Facts Satisfy Rule 8</u>

122. The McManus Movants and the Butsavage Movants argue Buyer has failed to state a claim against them for breach of contract because Buyer has failed to satisfy Rule 8(a)'s notice pleading requirement. For the reasons discussed below, the Court disagrees.

123. Unlike a claim for fraud, a pleading alleging breach of contract need only meet the requirements of Rule 8(a) of the North Carolina Rules of Civil Procedure. *See Haynie v. Cobb*, 207 N.C. App. 143, 148, 698 S.E.2d 194, 198 (2010) ("The general standard for civil pleadings in North Carolina is notice pleading." (quoting *Murdock v. Chatham Cty.*, 198 N.C. App. 309, 316, 679 S.E.2d 850, 855 (2009))). Under Rule 8(a)(1), a pleading asserting a claim must contain "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]" N.C. R. Civ. P. 8(a)(1). Under this "notice pleading" standard, "a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of *res judicata*, and to show the type

of case brought." *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014) (quoting *Sutton*, 277 N.C. at 102, 176 S.E.2d at 165).

124. A trial court may dismiss a pleading that violates Rule 8(a)(1) via Rule 41(b). *Plasman v. Decca Furniture (USA), Inc.*, No. COA17-151, slip op. at 17 (N.C. Ct. App. Feb. 6, 2018). Dismissal is appropriate if the trial court first determines "the appropriateness of lesser sanctions" for failing to comply with Rule 8. *Id.* at 8 (quoting *Wilder v. Wilder*, 146 N.C. App. 574, 577, 553 S.E.2d 425, 427 (2001)). When the trial court engages in such an analysis, "its resulting order will be reversed on appeal only for an abuse of discretion." *Id.* at 8–9. In this case, however, the Court concludes that Buyer's claim is adequately stated.

125. Buyer's pleaded facts here, taken as true, establish the following. Each of the McManus Movants and Butsavage Movants was a shareholder of Seller. Each signed the SPA as a shareholder of Seller. The SPA provided that under certain circumstances, e.g., the breach or inaccuracy of the warranties and representations in Article IV of the SPA, the shareholders agreed to indemnify Buyer. Buyer alleges that these circumstances have now occurred and that the shareholders are thus obligated to indemnify Buyer. The SACC expressly (i) includes the McManus Movants and the Butsavage Movants in the designated group identified as "Third-Party Defendants," (SACC 2), (ii) sets out the representations and warranties in the SPA Buyer believes were breached or were inaccurate, (SACC ¶ 102), (iii) states why Buyer believes the representations and warranties were breached, (SACC ¶ 102), and

(iv) alleges that "Tillery . . . and Third-Party Defendants" have refused to indemnify Buyer, breaching the SPA, (SACC ¶¶ 107–09).

126. These pleaded facts give the McManus Movants and Butsavage Movants sufficient notice of the transaction that produced Buyer's claim and the nature and basis of the claim, allow for trial preparation, allow for the application of *res judicata*, and show the type of case brought. Thus, Buyer's claim for breach of contract and indemnification against the McManus Movants and the Butsavage Movants meets the requirements of Rule 8(a), and their respective motions to dismiss this claim should be denied.

### 2. The Shareholders' Obligation to Indemnify

127. The McManus Movants and Butsavage Movants also contend that Buyer's claim against them for breach of contract and indemnification should be dismissed because Buyer has not pleaded that either group breached the SPA or failed to comply with a duty under the SPA. The pleaded facts in the SACC say otherwise.

128. As stated above, the SACC contains pleaded facts that establish that the McManus Movants and Butsavage Movants were parties to the SPA and agreed to indemnify Buyer for the breach of certain representations and warranties contained therein. Buyer has also alleged that breaches occurred that entitle Buyer to indemnification and that, despite Buyer's notice, Tillery and the shareholders of Seller have refused to indemnify Buyer or release the escrowed funds to Buyer. While the Court will discuss the sufficiency of Buyer's allegations that specific sections of the SPA were breached below, if any representation or warranty was breached, Buyer

has pleaded sufficient facts to establish that the shareholders of Seller had an obligation to indemnify Buyer. A wrongful refusal to do so would be a breach of the SPA. Thus, Buyer has sufficiently alleged a breach of contract and indemnification claim against the shareholders of Seller to the extent the Court concludes Buyer has sufficiently pleaded that a relevant representation and warranty in the SPA was breached or was inaccurate.

### 3. Breach of Article IV's Representations and Warranties

129. Movants' most fact-intensive argument challenges Buyer's breach of contract and indemnification claims by contending that Buyer has failed to plead that any representations and warranties made in the SPA were breached or were misleading.

130. Buyer argues that it is entitled to indemnification because the alleged concealment of the Roofing Death and Undisclosed Injuries "constitutes a breach of the Representations and Warranties included in, but not limited to Sections 4.3, 4.4, 4.8, 4.11, 4.13, and 4.21 of the SPA." (SACC ¶ 102.) Movants counter by asserting that none of the enumerated sections required the Roofing Death or the Undisclosed Injuries to be disclosed. Buyer also asserts that the uncollectible Honeywell and Benesch invoices resulted in breaches of sections 4.3 and 4.8 of the SPA. The Court evaluates each section in turn.

### a. Breach of Article IV: Section 4.3

131. Section 4.3 included two sets of representations. First, section 4.3(a) stated that the financial statements attached to the SPA were "prepared in accordance with

GAAP . . . and present[ed] fairly in all material respects the financial condition of the A&D Companies collectively[.]" (SPA § 4.3(a).) Second, section 4.3(b) represented and warranted that "[n]o A&D Company ha[d] any Liabilities of a nature required to be or customarily reflected in a balance sheet (or the notes thereto) prepared in accordance with GAAP that [were] not reflected or reserved against in the Financial Statements," except, notably, liabilities incurred after February 28, 2015. (SPA § 4.3(b).) The SPA defined "Liability" as "any liability, residual, loss, obligation, claim or commitment of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due." (SPA 7.)

132. Buyer asserts that section 4.3 was breached because the Undisclosed Injuries and Roofing Death were "Liabilities" that should have been reflected in Seller's financial statements. Buyer also argues that section 4.3 was breached by Seller's inclusion of the Honeywell and Benesch invoices in Seller's accounts receivable. Movants respond that section 4.3 was not breached because Seller only received notice of one of the Undisclosed Injuries before February 28, 2015. They also argue that the Injuries were immaterial, and thus did not need to be included in the financial statements for the statements to "present fairly in all material respects the financial condition of the A&D Companies," (SPA § 4.3.), because it appears that the Undisclosed Injuries were covered by workers' compensation insurance and Buyer has not alleged that knowledge of the Injuries would have significantly impacted

Buyer's decisions. The Court does not find Movants' arguments persuasive at this stage of the case.

133. Buyer's pleaded facts show that two of the Undisclosed Injuries occurred before February 28, 2015, and Seller is alleged to have been aware of one of the Injuries prior to that date. As noted above, Buyer has also pleaded several ways information about the Undisclosed Injuries would have been important to Buyer. The importance of this information was not limited solely to the issue of whether Buyer or an insurance company would have to pay the injured employee. Instead, it would have provided Buyer context about Seller's safety ratings and the likelihood they would deteriorate in the future—information directly relevant to the overall value of the A&D Companies. Movants also fail to provide a convincing argument to rebut Buyer's allegations about the Honeywell and Benesch invoices.

134. All in all, although the SACC is scant on details about the required contents of the financial statements, it does not reveal an absence of fact necessary to plead Buyer's claims, nor does it disclose a fact that necessarily defeats Buyer's claims. For these reasons, the Court is not prepared to conclude that Buyer has failed to state a claim as to the breach of section 4.3. Buyer has alleged the provision of the SPA that Buyer believes was breached and why Buyer believes this provision was breached. Buyer's allegations will provide Movants the opportunity to answer and prepare their case, allow for the application of *res judicata*, and show the type of case Buyer brings. Whether Buyer can proffer evidence showing that the pre-February 28 Undisclosed Injuries should have been reflected on Seller's financial statements will be addressed

at a later stage of the case. *See Ussery*, 368 N.C. at 334, 777 S.E.2d at 278 (movant is entitled to summary judgment "where a claim or defense is utterly baseless in fact.")

### b. Breach of Article IV: Section 4.4(b)

135. Section 4.4(b) of the SPA represented to Buyer that "[s]ince [February 28, 2015] . . . no A&D Company ha[d] experienced any damage, destruction, or loss (not covered by insurance) to its assets in the aggregate in excess of $25,000." (SPA § 4.4(b).) Buyer contends that this representation and warranty was breached because the Undisclosed Injuries have rendered many of Buyer's contracts with customers vulnerable to termination. The Court disagrees with this assertion. Buyer's pleading does not contain allegations indicating that the A&D Companies' assets sustained a loss, damage, or destruction in excess of $25,000 that was not covered by insurance. Buyer has thus failed to allege, after multiple chances to bring its counterclaims, that section 4.4(b) was breached. The Court will therefore dismiss Buyer's claim for breach of contract and indemnification as to section 4.4(b) with prejudice.

### c. Breach of Article IV: Sections 4.4(m) and 4.4(n)

136. As for sections 4.4(m) and 4.4(n), the Court concludes, for the reasons explained above in connection with Buyer's other claims for relief, that Buyer has pleaded sufficient facts such that a reasonable finder of fact could conclude that the representations and warranties in sections 4.4(m) and 4.4(n) were inaccurate in light of the Undisclosed Injuries and Roofing Death. The Court does not find Movants'

arguments to the contrary convincing at this stage of the case. Thus, the Motions to Dismiss are denied as to Buyer's claim for breach of contract and indemnification to the extent Buyer's claim is based on sections 4.4(m) and 4.4(n).

d. Breach of Article IV: Section 4.8

137. Section 4.8 of the SPA represented and warranted to Buyer that the accounts receivable reflected on Seller's "Closing Date Balance Sheet" were "bona fide obligations in favor of the A&D companies" and were not, in the aggregate, "subject to any pending or threatened defense, counterclaim, right of offset, returns, allowances or credits, except for early payment discounts in the ordinary course of business or except to the extent reserved against on the Closing Date Balance Sheet or which would not have a Material Adverse Effect." (SPA § 4.8.) Buyer asserts that Movants must indemnify it for a breach of section 4.8 because Seller's failure to disclose the Undisclosed Injuries and Roofing Death constituted a breach of this section. Buyer also argues that section 4.8 was breached due to Buyer's inability to collect on the Honeywell and Benesch invoices.

138. The Court does not agree with Buyer that Seller's alleged concealment and nondisclosure of the Undisclosed Injuries and the Roofing Death constitute a breach of section 4.8. Even viewing the facts in the light most favorable to Buyer, the SACC does not contain any alleged facts linking the Undisclosed Injuries or the Roofing Death to the subject matter of section 4.8—Seller's accounts receivable reflected on the Closing Date Balance Sheet. Buyer thus cannot base its claims for a breach of section 4.8 on the Undisclosed Injuries or the Roofing Death.

139. In contrast, Buyer's allegations regarding the Honeywell and Benesch invoices do provide facts sufficient to state a claim for breach of section 4.8. Section 4.8 warranted that these invoices, included in Seller's accounts receivable reporting, represented bona fide obligations to the A&D Companies that were not subject to "any pending or threatened defense, counterclaim, right of offset, returns, allowances or credits[.]" (SPA § 4.8.) Buyer has alleged that the Honeywell invoice was subject to a credit and that the Benesch invoice was only issued as a result of Seller's failure to properly document change orders. These allegations, if true, would result in a breach of section 4.8. Thus, the Court concludes Buyer has properly stated a claim for breach of contract and indemnification as to section 4.8 to this extent.

e. Breach of Article IV: Sections 4.11, 4.13, and 4.21

140. Buyer also contends that Movants are obligated to indemnify Buyer for breaches of the representations and warranties made in sections 4.11, 4.13, and 4.21 of the SPA. Movants argue that Buyer did not provide timely notice under the SPA that Buyer was seeking indemnification for these sections and thus deny the existence of any such obligation. The Court need not address the adequacy of Buyer's demand, however, because regardless of whether that demand was sufficient to allow the representations and warranties in sections 4.11, 4.13, and 4.21 to survive, Buyer has not pleaded sufficient facts to show the representations or warranties in these sections were breached.

141. In pertinent part, section 4.11 represented to Buyer that "to the Company's Knowledge, no event ha[d] occurred that with notice or lapse of time would constitute

a breach or default, or permit termination, cancellation, modification, or acceleration, under any Material Contract." (SPA § 4.11(b).) Buyer argues this representation and warranty was breached in two ways, but both arguments suffer from the same problem: Buyer has failed to plead all of the facts needed to claim section 4.11 was breached.

142. First, Buyer asserts in the SACC that Seller's failure to disclose the Undisclosed Injuries and the Roofing Death constituted a breach of section 4.11. Buyer argues this is the case because the Undisclosed Injuries have resulted in rising safety ratings that have in turn rendered certain contracts with A&D customers— including Material Contracts, as that term is defined by the SPA—subject to termination.

143. The problem with Buyer's first argument is that it mistakes what "event" allegedly triggered the possible termination of A&D's contracts. Buyer's pleaded facts state that A&D's customers condition their contracts on A&D maintaining certain EMR and TRIR figures. Thus, while workplace injuries would have contributed to deteriorating safety rates, the "event' that would have rendered Buyer's newly acquired contracts subject to termination would have been the setting of higher safety rates, not the occurrence of a particular injury. The fact that Buyer's contracts eventually became subject to termination and are currently vulnerable does not show that section 4.11 was ever breached—Buyer has not alleged that at the time of the SPA's execution on May 8, 2015 Seller had any knowledge (as that term was defined) of an event that rendered A&D's contracts subject to termination at that point in

time. For example, A&D's EMR was 1.13 just before the SPA was executed, but Buyer has not alleged that the 2015 EMR would have permitted customers to terminate their contracts. Buyer relies only on allegations of its current predicament, which Seller would not have had knowledge of in 2015. Thus, Buyer's pleaded facts do not show section 4.11 was breached.

144. Second, within its brief, Buyer also argues that Seller's inaccurate reporting of the Honeywell and Benesch invoices breached section 4.11. This argument fails too. Section 4.11's representations related to Material Contracts, a term defined in the SPA. (SPA § 4.11(a).) Buyer's SACC contains no facts to suggest that the Honeywell or Benesch invoices were Material Contracts. Thus, Buyer has failed to plead sufficient facts to state a claim for breach of section 4.11 under both of its arguments.

145. Section 4.13, titled "Litigation," represented and warranted to Buyer that there was "no Proceeding currently pending or, to the Company's Knowledge, threatened in writing against any A&D Company affecting (a) an A&D Company that would have a Material Adverse Effect, or (b) the Transaction." (SPA § 4.13.) In its brief, Buyer argues that the Roofing Death constituted threatened litigation. At the hearing, Buyer also argued that the Undisclosed Injuries constituted threatened or pending litigation that would have breached section 4.13.

146. Buyer's first assertion is squarely contradicted by Buyer's demand for indemnification to Seller, which indicated that as of November 4, 2016 "no claim ha[d] been asserted or alleged" as a result of the Roofing Death. (SACC Ex. 26, at 2.) Buyer

has also failed to plead any facts that show "Proceedings," as defined by the SPA, were pending or had been threatened in writing against any A&D Company as a result of the Undisclosed Injuries. Thus, Buyer fails to allege sufficient facts to state a claim for breach of contract and indemnification based on section 4.13.

147. Section 4.21 concerned the A&D Companies' customer relationships and represented and warranted that Seller had not received information indicating customers may be terminating or altering their relationships with the A&D Companies:

> Since January 1, 2015 there has not been any actual or, to the Company's Knowledge, threatened in writing, termination or cancellation of, or any material adverse modification in the business relationship of the Business with any [of Seller's top twenty customers and top twenty suppliers]. To the Company's Knowledge, there are no material outstanding disputes with any customer or supplier [listed in the schedule of top customers and suppliers]. To the Knowledge of the Company, no such customer or supplier has provided notice to the A&D Companies that it will materially change its relationship with the Business, or the terms thereof, as a result of the Transactions.

(SPA § 4.21.)

148. As with sections 4.11 and 4.13, Buyer has failed to plead all of the necessary facts to establish that section 4.21 was breached. The SACC contains allegations that Buyer's contracts are now subject to termination, but there are no allegations of actual terminations or terminations threatened in writing. Buyer has also failed to allege that Seller or any of the parties to this lawsuit knew of a "material outstanding dispute" with a customer or supplier at the time of closing.[10] Finally, Buyer has not

---

[10] While the SACC includes reference to Seller being in a "dilemma" with "customer Georgia Pacific" and receiving low "post-work evaluations" from Georgia Pacific, (SACC ¶ 53), Buyer has pleaded no facts indicating an actual dispute between Seller and Georgia Pacific. Buyer has also not pleaded that Georgia Pacific was a customer to which section 4.21 applied, i.e.,

alleged that any customer or supplier of the A&D Companies materially changed its relationship with the A&D Companies as a result of the SPA, the Escrow Agreement, or any of the transactions undertaken to carry out the two agreements. Thus, as with sections 4.11 and 4.13, Buyer fails to allege sufficient facts to state a claim for breach of contract and indemnification based on section 4.21.

    4. <u>The Terms of the SPA and Escrow Agreement do not Bar Buyer's Claims</u>

149. In addition to arguing that Buyer has failed to plead the foundational facts necessary for breach of contract, Movants also argue that the terms of the SPA and the Escrow Agreement bar Buyer from bringing its claims. First, Movants assert that Buyer provided insufficient notice to bring its claims under the terms of the Escrow Agreement. Second, Movants argue that Buyer's claims do not exceed the minimum indemnification amount required by the SPA. These arguments present fact-based contentions, however, that must be resolved at a later stage of these proceedings.

150. Beginning with the notice requirement Movants reference, Movants argue that Buyer's demand did not comply with the Escrow Agreement's notice requirements because the demand did not give a total sum of money Buyer claimed it was owed. Therefore, Movants assert, they have no obligation to indemnify Buyer.

151. The Escrow Agreement's language, however, does not favor Movants as a matter of law. The Escrow Agreement required a written demand "setting forth in reasonable detail the basis of such Claim and the amount sought to be paid from the

---

a top twenty customer. Thus, this one-time reference to a "dilemma" with a customer does not support Buyer's claim that section 4.21 was breached.

Escrow Fund." (Escrow Agreement 2.) This language does not clearly indicate whether "reasonable detail" modifies "the basis of such Claim" alone or both requirements, i.e., "the basis of such Claim and the amount sought."

152. When interpreting a contract, a court seeks to understand the parties' intent by looking to the language used. *State v. Philip Morris USA Inc.*, 363 N.C. 623, 631, 685 S.E.2d 85, 90 (2009). Contracts that are plain and unambiguous may be interpreted by the Court as a matter of law. *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 513, 722 S.E.2d 1, 8 (2012). When the effect of a provision of a contract is uncertain, however, or capable of multiple reasonable interpretations, that provision will be considered ambiguous. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 525, 723 S.E.2d 744, 748 (2012). The interpretation of ambiguous contract terms is a question of fact left for the jury. *Id.*

153. The Escrow Agreement's requirement for a written demand is capable of multiple reasonable interpretations. Its effect is thus a question of fact. Viewing this question of fact in the light most favorable to Buyer, the Court concludes Buyer has pleaded facts showing the Escrow Agreement's notice requirement was fulfilled. Buyer's demand explained the factual basis for Buyer's claims—e.g., the Undisclosed Injuries, the Roofing Death, and the uncollectable invoices—and made various statements as to the amount Buyer sought. Writing about several grounds for its claim, Buyer listed definite monetary sums it believed it was owed. For other factual bases for its claims, Buyer alleged that the damage was impossible to quantify but that it exceeded the $260,000 minimum set by the SPA for indemnification claims.

Buyer further demanded that the "Escrow Fund not be reduced in any way" because the "total indemnifiable claims" would exceed any minimum amount set by the SPA. (SACC Ex. 26, at 2, 4.) Taken together at this stage of the case, the Court believes these facts provided Tillery and the escrow agent with reasonable detail as to the amount Buyer sought. Thus, the Court declines to adopt Movants' interpretation of the Escrow Agreement's notice provision and will not dismiss Buyer's claim on this ground at this stage. *See IWTMM, Inc. v. Forest Hills Rest Home*, 156 N.C. App. 556, 563, 577 S.E.2d 175, 179 (2003) ("How to properly interpret [a contract open to two interpretations], however, is a factual issue not appropriate for consideration under a 12(b)(6) challenge.")

154. Last, turning to Movants' argument on the minimum amount of losses Buyer must have suffered to be entitled to indemnification, the Court notes only that the minimum amount set by the SPA is $260,000, and Buyer's surviving claims in this lawsuit demand a total amount in excess of $260,000. (SACC ¶ 109.) Thus, this provision does not prevent Buyer from stating a claim for breach of contract and indemnification.

V.

CONCLUSION

155. **WHEREFORE**, for the foregoing reasons, the Court hereby **ORDERS** as follows:

    a. As to Buyer's claim for fraud asserted against the Tillery Movants:

i. The Tillery Motion is **DENIED** as to Tillery, Weidenhammer, Ruggiero, and Taveira to the extent Buyer's claim is based on the Undisclosed Injuries or Roofing Death.

ii. The Tillery Motion is **DENIED** as to Tillery, Weidenhammer, and Taveira to the extent Buyer's claim is based on a failure to disclose the 2015 EMR number.

iii. The Tillery Motion is **DENIED** as to Tillery, Weidenhammer, and Taveira to the extent Buyer's claim is based on the other allegedly misleading EMR numbers produced to Buyer during due diligence.

iv. The Tillery Motion is **GRANTED** and Buyer's claim against Ruggiero is dismissed with prejudice to the extent the claim is based on a failure to disclose Seller's 2015 EMR.

v. The Tillery Motion is **GRANTED** and Buyer's claim against Ruggiero is dismissed with prejudice to the extent the claim is based on the other allegedly misleading EMR numbers produced to Buyer during due diligence.

b. The Court **DENIES** the Tillery Motion with regard to Buyer's claim against the Tillery Movants for violations of the North Carolina Securities Act.

c. As to Buyer's claims for breach of contract and indemnification against Movants:

i. The Motions to Dismiss are **DENIED** to the extent Buyer's claims are based on sections 4.3, 4.4(m), or 4.4(n) of the SPA.

ii. The Motions to Dismiss are **DENIED** to the extent Buyer's claims are based on a breach of section 4.8 due to the unpaid Honeywell and Benesch invoices. To the extent Buyer's claims are otherwise based on section 4.8, the Motions to Dismiss are **GRANTED** and Buyer's claims are dismissed with prejudice.

iii. The Motions to Dismiss are **GRANTED** and Buyer's claims are dismissed with prejudice to the extent they are based on sections 4.4(b), 4.11, 4.13, and 4.21 of the SPA.

**SO ORDERED**, this the 9th day of February, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases